D. S. Pate Lumber Co. v. Weathers.

(Division A.   March 6, 1933.   Suggestion of Error Overruled May 1, 1933.)

[146 So. 433.   No. 30078.]

Owen & Garnett, of Columbus, and **Green, Green & Jackson**, of Jackson, for appellant.

Frierson & Anderson, of Columbus, for appellee.

**McGowen, J.,** delivered the opinion of the court.

The appellee, Weathers, filed his bill in the chancery court of Lowndes county, seeking to recover from the D. S. Pate Lumber Company, a corporation with offices in Chicago, Illinois, and in Columbus, Mississippi, certain overcharges consisting of interest, usury, and especially certain brokerage charges extending from March, 1922, until a short time prior to October, 1929; and he also specifically sought to recover fifty cents per thousand feet on lumber sold for him by the D. S. Pate Lumber Company, charged to his account, as brokerage, as alleged, fraudulently, and which was not permitted by the terms of a written contract made an exhibit to his bill.

The appellant, D. S. Pate Lumber Company, filed its answer denying the excessive charges, and setting up, in reference to the fifty cents brokerage charge, that this charge had been paid by it according to the established usage and custom, well known to Weathers, and of long duration. The answer was made a cross-bill and sought recovery over from Weathers of overpayments made by the lumber company.

Weathers filed his answer to the cross-bill denying the items of overcharge, and seeking to amend his original bill by asserting that having charged the fifty cents brokerage, the lumber company was not entitled to charge him ten per cent commission on sales made by the company for him.

There were many amendments by both sides and the record discloses much pleading. A motion was made to strike from the answer to the cross-bill the effort to amend the original bill in the answer to the cross-bill; this does not appear to have been acted upon by the court. It is conceded that it ought to have been sustained.

On the trial, and before the introduction of any testimony, the appellee, Weathers, complainant in the court below, announced orally through his counsel that he would abandon all claims except the item of fifty cents per thousand feet brokerage charged to him by the lum-

ber company, and that the only issue upon which he would offer evidence would be as to the fraudulent charge of brokerage to him by the lumber company. Thereupon, counsel for the lumber company announced that the single issue would be upon the question of this brokerage, and that respondent and cross-complainant would, upon that understanding, abandon any claim to a recovery on the cross-bill.

Upon this agreement of counsel, the case was tried, and the evidence, in the main, was directed to the single issue indicated.

The court below, in its decree, recited these facts at length, and stated the issue to be as shown by the pleadings above set forth, and thereupon based its decree for Weathers upon answers to interrogatories propounded to the lumber company by Weathers, and allowed a recovery of brokerage in the aggregate sum of three thousand two hundred twenty-six dollars and forty-three cents as of the date of the decree, from which the lumber company prosecutes this appeal.

The written contract upon which the transactions took place provided for the financing by the lumber company of Weathers in the operation of his sawmill; the delivery of the output thereof to the lumber company at its yards in Mississippi, and conveyed full title, possession, and control of the output of Weathers' sawmill to the lumber company. The applicable part of the contract, in addition to the above statement, is in the following words:

"Party of the first part agrees to keep all lumber insured with loss payable clause made payable to party of the second part, as their interest may appear.

"It is further expressly understood and agreed that the lumber herein conveyed and delivered is sold at the current price of grade of which said lumber is at times of delivery at final destination and on inspection thereof, and that final settlement is to be made on final report from shipment thereof to the Columbus, Mississippi, office, or any other office of said second party that it may

designate, and in consideration of payment in cash of the hereinbefore mentioned sum on delivery of said hereinbefore described lumber, it is mutually agreed by the parties hereto that the said party of the second part shall have ten per centum thereof, on the price of said lumber for various services rendered in connection therewith and for selling and marketing same, on receiving final report on the shipment of the lumber herein conveyed.''

There was no contention but that the ten per cent commission was to be charged Weathers upon the net proceeds of sales by the lumber company.

Weathers' testimony was to the effect that he did not know until a very short time before filing his bill that the lumber company had charged him fifty cents per thousand feet brokerage.

The record shows that the lumber company had handled and sold for Weathers approximately thirteen million feet of lumber. There was a brokerage charge, in addition to the ten per cent, on approximately five million feet of lumber. The record also shows that the lumber company sold much lumber in transit, consigning the lumber from itself in Columbus, Mississippi, to itself in Chicago, Illinois, and reconsigning such lumber as it was sold in carload lots to ultimate buyers wheresoever located.

There is no contention about the lumber sold on which there were no brokerage charges. Weathers showed that the account sales would be delivered to him with all charges, freight, commission of ten per cent, etc., but not upon any report furnished to him was there any charge of fifty cents per thousand feet brokerage, but it clearly appears that the lumber company would sell, through brokers, to ultimate buyers, at fifty cents per thousand feet higher than it would report to Weathers. By his testimony, Weathers established that the fifty cents brokerage charged to him was without his knowledge and consent, and he contended that the lumber company should pay this charge; it having been wrongfully charged to him without his knowledge and consent.

On its books, a copy being filed as an exhibit here, it appears that the lumber company would state the full amount of sale of lumber to a particular individual, the amount of brokerage, commission, freight, certain discounts, its own commission of ten per cent thereof, but on statements rendered to Weathers no brokerage charges would appear, except at one time, in 1925, when the lumber company, by mistake, rendered to Weathers an account sale at prices which had actually been obtained, and in a short time sent a corrected account sale to Weathers at a reduced price. Weathers testified as to this, saying that he went to the office of the Pate Lumber Company, and asked about this particular charge, saying he should not be charged brokerage. He also said that one of the managers told him that this was a bad car, and that they were threatened with demurrage on this car, and that this explained the charge; but that neither before nor since that time had there been any statement showing any effort to charge him with brokerage, and that the business continued as before until a short time before this suit was brought.

In short, the books of the lumber company showed the transaction as it actually occurred. The statements rendered to Weathers did not reflect the exact brokerage charges and omitted all reference thereto.

Several lumber dealers were introduced who testified that they knew of specific cases in the sale of lumber where lumber companies, if they saw fit to do so, charged brokerage on sales. In other words, if lumber was sold by the Pate Lumber Company at thirty dollars per thousand feet, the middleman, who really produced the lumber, would receive twenty-nine dollars and fifty cents per thousand feet. However, these sawmill men were not shown to have had a contract such as we have set forth heretofore in the case at bar. There were several dealers operating apparently in the same manner that the Pate Lumber Company operates, who testified that it was their custom to sell lumber through a broker, and in

their settlement with the mill men for whom they procured the sales, to make no reference to brokerage charges; but it is not shown that any of these factors who so testified had a contract with any of their customers to furnish lumber which amounted to the relation of mortgagor and mortgagee, and which authorized the possession and control of the output of the sawmill by the factors.

1. It is contended by the appellant, the Pate Lumber Company, that the decree is not based upon any pleading. This contention is based upon the fact that Weathers undertook in his cross-bill to amend his original bill, and thereby sue for the ten per cent commission paid instead of the fifty cents per thousand feet brokerage as set forth fully in the original bill.

While we do not, in the slightest degree, desire to say that we lend our approval to loose pleading, yet it is perfectly apparent that the parties to this litigation agreed to and did try the case upon a single issue, whether or not the brokerage should be paid by the lumber company or by Weathers. The court so understood, and so recited in its decree, and we will not disturb its decree for that reason. The parties are bound by their agreement, where the terms thereof appear plainly in the record, and the appellant cannot now be heard to say that there was no pleading as a matter of fact. The allegations as to brokerage in the original bill were never actually, by order of the court, permitted to be withdrawn therefrom, and by its decree, the court found that the bill presented this issue.

2. It is insisted by the appellant that there is a total failure of proof. This contention is based upon the credibility of Weathers as a witness for himself. There was an effort to contradict him by showing that in 1925 he was advised as to the brokerage charges. There were inconsistencies on both sides, and we cannot say that the chancellor was wrong in adopting Weathers' version and testimony. It is pretty clear from this record that either

by design, accident, or otherwise, the lumber company did not, in its statements rendered to Weathers, at any time, except in the one instance, in 1925, disclose the true status of its own books in reference to Weathers as to this brokerage. We cannot say the chancellor was manifestly wrong.

3. It is next contended that the record reflects that the lumber company sold Weathers' lumber to a particular broker who, in turn, sold it to the ultimate buyer, and that, for convenience, there was a substituted contract by which the lumber company dealt directly with the broker's buyer. On this question, the record shows that this lumber was sold through brokers; that the lumber company would invoice the lumber as directed by the broker to the purchaser, and not to the broker; that the lumber was never delivered or attempted to be delivered to the broker, but was delivered to the actual purchaser. On the books, the transaction did not appear to be between the lumber dealer and the broker. The purchaser of the lumber would not pay the broker, but paid the lumber company, whereupon the lumber company would remit fifty cents per thousand feet to the broker to pay his charges therein, and pay the balance to Weathers after deducting its charges.

Under this contract, the sole duty of marketing and selling this lumber, over which the lumber company had complete possession and control, was upon it. The appellee, by his contract, placed entire trust and confidence in the lumber company, and the lumber company, on its part, assumed that trust and confidence in assuming the relation to Weathers of factor and agent with almost unlimited power and authority, and for its services it was to receive a ten per cent commission. The difference between a factor and a broker is that a broker does not receive possession of the property he sells for another, while a factor takes the property into his possession for the purpose of selling it, having full control thereof. The lumber company, in this case, acted as Weathers'

factor, and, as such, dealt with him, and his property, and the instance referred to in 1925 cannot be said to have changed the contract, or to have put Weathers, the principal, upon notice that his agent and factor, the lumber company, was charging him with brokerage instead of paying it themselves. By their contract, the lumber company could sell through brokers, or in any other lawful manner it desired. The lumber company was under duty to market and sell this lumber. When they sold through brokers, the brokers were the agents of the factors so far as Weathers was concerned. If we were to approve this magical scheme, it would mean that, by the terms of the contract, Weathers could be required to pay an endless chain of brokers. There was nothing in the transaction of 1925 to put Weathers upon any notice that he was not being dealt with upon the specific terms of the contract by which he and the lumber company were bound, and we decline to, at all, recognize that there was any sale of any property by the lumber company to a broker. The broker was in no instance trusted to the extent of a single cent so far as this record discloses. The books of the lumber company show clearly that it sold through, and not to, the broker.

Counsel for appellee illustrate this transaction as follows: "The gist of appellee's claim is that this fifty cent brokerage item, so called, did not appear in appellant's billing to him. For example, the billing from appellant to 'Smith' would be for thirty dollars for the carload of lumber, and while it might appear in form a sale by appellant to 'Smith' yet an 'offset' due to two sales one to the 'broker' the other by the broker. This billing by appellant to 'Smith' direct was, under the custom of the trade, to avoid the inconvenience and danger of appellant billing to the broker, and the broker billing to Smith. The same result was attained by appellant billing to Smith for the thirty dollars and when the thirty dollars was paid to appellant by Smith, appellant would distribute it, fifty cents to the broker as his profit on his

sale to Smith, and the twenty-nine dollars and fifty cents, the price the broker was to pay to appellant, less the ten per cent commission was paid over to appellee, as more fully later shown.''

4. It is next insisted that the testimony of the three witnesses, Alexander, Reid, and Gray, who were manufacturers and wholesale dealers, established that there was a universal custom in this kind of trade for sawmill men to pay brokers, in addition to the ten per cent, a brokerage charge. They so testified, but none of them testified that, in dealing with their principals, they had any such contract as in the case at bar, where the factor not only had control of the lumber on hand, but of the entire output of his principal's sawmill. This contract sets at defiance the law governing the course of dealing between a principal and his agent. It is rather novel that an agent can establish a custom not to render a true account to his principal. This custom or usage is contrary to all principles which govern the course of dealing between agents and principals, especially where the relation is intensified and close, as is disclosed by this record. The relation is agreed to be that of mortgagor and mortgagee, and that custom or usage cannot prevail when opposed to the law. But, if we should say that this custom was established, it cannot possibly apply to the contract in this case. This custom would vary and alter an existing contract entered into as set forth in the statement of facts. By the contract in the case at bar, the lumber company was created the agent and factor of Weathers to market and sell his lumber, and for its services it was to receive a commission of ten per cent. The record discloses that this ten per cent commission yielded the lumber company from twenty-nine to ninety-five dollars per car, and that brokerage would vary from eight dollars and fifty cents to fourteen dollars per car, for which excessive charge the lumber company is contending.

We do not think this contract can have imposed upon

it, with reference to the sale and marketing of the lumber, this additional burden.

In the case of Postal Tel. Co. v. Willis, 93 Miss. 540, 47 So. 380, 381, the position of the court on this question is fully set forth in a quotation from 2 Page on Contracts, p. 928, reading as follows: "The true and appropriate office of a usage or custom is to interpret the otherwise indeterminate intention of parties, and to ascertain the nature and extent of their contracts, arising, not from express stipulations, but from mere implications, assumptions, and acts of a doubtful or equivocal character." And, further, "Where the contract is definite and certain, the obligations of a party, by reason of the contract, become fixed by law by the terms of the contract which they have entered into, and where there is nothing uncertain left in the contract, usage or custom has no place."

The custom or usage sought to be invoked here would tend to destroy the confidence between principal and agent, and would permit an agent to conceal the true status of accounts from his principal, and to rely upon usage or custom, in direct conflict with the written contract between principal and agent.

Further, it would impose upon a plain stipulation that the marketing and selling was to be done by an agent for a principal on a commission of ten per cent, and the further payment of as many additional brokers as the factor might see fit to employ. This cannot be tolerated.

5. The last point is that the plea of the statute of limitation of three years should avail as to the transactions subsequent to the time when this statement was rendered, showing Weathers the actual facts of the case. The appellant argues, but without clearly stating how, that the statute of limitation applies to this case. We again reiterate that this record discloses that, for reasons of its own, the agent and factor, the lumber company, kept a set of books showing sales at one price, charging Weathers with brokerage, while it rendered to him a statement showing sales at a lower price, covering the

brokerage, and no special charge for brokerage was disclosed thereon.

In our opinion, whatever may have been the motive, this brokerage charge was artfully concealed from Weathers, if his evidence is to be believed, and we have hitherto said that we would not disturb the finding of the lower court as to his credibility and the weight of his evidence. There was sent to him a statement which reflected what the books showed in the particular instance, but he was told that the extra charge was for demurrage, which means a delay. According to his statement, which the court below had a right to believe, although denied by the agent, this instance was explained as nothing more than an ordinary business mistake which amounted, in that case, to only a few dollars. There was nothing calculated to arouse his suspicion that this double charge for selling his lumber was being conducted throughout the entire course of his dealing with the lumber company. The explanation put him to sleep, as it would a more astute business man.

It is clear, including all the import that can be given to these incidents, that this cause of action was concealed from Weathers. There is much in the record to support Weathers' theory, and to uphold his version of their course of dealing, and how this lumber was handled in selling it.

Section 2312, Code of 1930, which was in force during all of this period, reads as follows: "If a person liable to any personal action shall fraudulently conceal the cause of action from the knowledge of the person entitled thereto, the cause of action shall be deemed to have first accrued at, and not before, the time at which such fraud shall be, or with reasonable diligence might have been, first known or discovered."

We think the course of dealing, and especially the books of the Pate Lumber Company as shown by Exhibit A Weathers Lumber Company to the record, disclose that the true transactions were concealed by the agent from

the principal, and that Weathers' evidence is entirely believable that he did not discover it until a short time before the bill was filed.

So far as the argument is concerned, we see no reason to disturb the decree of the court below.

Affirmed.