420 So.2d 761 (1982)
Carolyn VOSS
v.
James R. STEWART and Anna Dauro Stewart, Co-Executors of the Estate of John P. Dauro, Deceased.
No. 53154.
Supreme Court of Mississippi.
September 29, 1982.
Rehearing Denied November 10, 1982.
*762 Wittmann, Berry & Sneed, Thomas D. Berry, Jr., Gulfport, for appellant.
Larry L. Lenoir, Gulfport, for appellee.
En Banc.
PATTERSON, Chief Justice, for the Court:
Carolyn Morreale Voss had appealed from a decree of the Chancery Court of Hancock County which dismissed her bill of complaint asserting rights to property devised to others by will. She claims an interest in the property by contract for her services, or alternatively, for payment for such services on a quantum meruit basis.
John and Mary Dauro, deceased, owned and operated two candy shops in Bay St. Louis during the 1950's until they died.[1] Carolyn Morreale, their niece, is the daughter of Mary Dauro's sister, as well as being the godchild of the Dauros. She helped them at Mary Ann's Gift Shop, their first store, in 1950 when she was only nine or ten years of age. The Dauros were attached to Carolyn, having no children of their own, and after purchasing the property[2] for the second shop in 1952, decided to name it after her.
The new candy shop was built in 1952, and during that year the Dauros went to Carolyn's home to discuss naming the store after her. Carolyn's father, Ben Morreale, testified their reason for so naming the shop was that it would become Carolyn's upon their death. Apparently the conversation led to the following undated instrument, handwritten by Mary Dauro, and witnessed by two friends of the Morreales and Dauros after being signed.
We, Mary F. & Johnnie Dauro agree to leave Carolyn's gift shop and anything on that property will go to Carolyn upon our death. The shop will be name Carolyns gift shop.
 Mary F. Dauro
 John P. Dauro
 Witness:
 Edward J. Gipson
 Louise Gipson
The record does not disclose whether Carolyn participated in this agreement and because of her tender years it seems unlikely that she could have done so. She, of course, could not testify under the "Dead Man's Statute" and because the witnesses to the *763 instrument had since died, its authenticity, if a will, was proved by Ben Morreale, as to the subscribing witnesses' signatures.[3]
The testimony reflects that Carolyn at times worked for the Dauros in the candy shop when not engaged in school affairs during the regular terms, and on a more regular schedule during school vacation until she graduated in 1957. Whether Carolyn was fully or partially compensated for her activities or paid at all, was sharply disputed. On this conflict the chancellor found, largely on the testimony of Helen Weber, another employee in the candy shop during those years, that Carolyn was in fact compensated weekly.[4]
There was also evidence of the Dauros being displeased with Carolyn because of a boy she briefly dated in high school, although the testimony varies as to the severity and whether there was a reconciliation.
In any event, John's brother Vincent, related statements made in later years by John and Mary Dauro to Vincent, which disclosed they intended at least at the time of the conversation, for Carolyn to have the shop upon their death, because they had started with little or nothing and Carolyn's help in the shop entitled her to something.
However, for reasons known only to him, John conveyed part of the subject property to Anna D. Stewart, another niece, on March 9, 1979. After John's death in 1979, there was admitted into probate John Dauro's will of July 25, 1973 wherein he devised his property to Helen Weber, Anna Dauro Stewart and her three children without mentioning Carolyn Voss or the gift shop.
On November 8, 1979, Carolyn probated a claim against Dauro's estate for $19,395 for services rendered. The claim however, was withdrawn, and this suit instituted, alleging that Carolyn and the Dauros had entered into a contract which was also a mutual will, wherein it was orally agreed that John and Mary would leave Carolyn's Gift Shop to Carolyn in consideration of her working in the candy shop. She charged the services were without compensation and that Dauro's subsequent will abrogated their agreement. There was also an allegation that the latter will was the product of undue influence and fraud. The complainant prayed she be granted the property upon which Carolyn's Candy Shop was situated, or in the alternative, for an award of $19,395 for services rendered.
An amended bill was filed alleging additionally that John Dauro had forgotten his previous promise because he was old, had become ill, and could neither read nor write, and for these and other reasons his estate should be estopped from conveying the subject property pursuant to his last will.
The issue is whether the 1952 instrument, if a will, was revoked by John Dauro. The resolution of this issue requires a scrutiny of the circumstances at the time of the first instrument's execution and thereafter.
Although the complaint did not request the 1952 instrument be admitted to probate as the last will of the Dauros, the issues presented necessarily required the trial court to resolve the question of whether it was subject to probate. Although our holding in Perry v. Aldrich, 251 Miss. 429, 169 So.2d 786 (1964), would not permit the probate of the earlier instrument when another writing had been probated as the last will of John Dauro, the trial court nevertheless held the earlier instrument to have been a valid will, which was revoked by the later *764 will. The court also found from the conflicting evidence, that "Ms. Weber had been an employee of the Dauros during a portion of the time that the complainant was working for the Dauros. Ms. Weber was paid for her work and her testimony was that the complainant was also paid." In a supplemented opinion, the trial court found that complainant "failed to prove that she is entitled to any relief based on a quantum merit (sic) basis by a preponderance of the evidence," whereupon the bill of complaint was dismissed.
The wording of the earlier writing did not refer to any services that Carolyn would perform for the Dauros. It mentioned only that the shop would be named "Carolyn's Gift Shop" and that the Dauros "agree" to leave it and anything on the property to Carolyn upon their deaths. Since the services entitling her to the property were not mentioned in writing it became Carolyn's burden to prove the agreement concerning her services by clear and convincing evidence and that she performed such in consideration of the promised devise.
If the burden of proof had been met by the complainant it would have had the effect of confirming the irrevocability of the 1952 will. See Monroe v. Holleman, 185 So.2d 443 (Miss. 1966); Denson v. Denson, 203 Miss. 146, 33 So.2d 311 (1948); Johnston v. Tomme, 199 Miss. 337, 24 So.2d 730 (1946); and, Price v. Craig, 164 Miss. 42, 143 So. 694 (1932). Our difficulty in the instant case is not so much the rule of law to be applied, as it is in finding facts from the evidence upon which to sustain the thesis claimed by the appellant.
The assignments of error urged for reversal are:
1. The trial court erred in failing to find there was a contract between the decedents and appellant shown by clear, convincing and credible evidence.
2. The trial court erred in finding that although it had found that there was a mutual will that it was revoked by Mary Dauro.
3. The trial court erred in finding that John Dauro revoked the mutual will after the death of his wife, Mary.
4. The trial court erred in finding that appellant was not entitled to compensation on a quantum meruit basis.
In addressing the first assignment for reversal we note that in Kalavros v. Deposit Guaranty Bank & Trust Co., 248 Miss. 107, 158 So.2d 740 (1963), we held the following concerning the degree of proof required in this type of case:
The chancellor rejected the claim of appellant, holding that the facts in this case fail to establish an irrevocable contract between the parties, which required Theo Grillis to make a will devising one-half of his property to appellant. We are of the opinion that the chancellor was correct in so doing, because the evidence is not "clear, definite and certain", as is required by the rule of law heretofore recognized in cases in this State where the contract is sought to be established to make a will. See In re Boyd's Estate, 228 Miss. 526, 87 So.2d 902; In re Reinecke's Estate, 225 Miss. 376, 83 So.2d 438. 158 So.2d at 743.
Although this court has acknowledged that an oral promise to devise property is enforceable where services were performed pursuant thereto, it has nevertheless circumscribed the essentials of such contract in addition to the requirement of "clear, definite and certain" evidence.
In Johnston v. Tomme, 199 Miss. 337, 24 So.2d 730 (1946), we stated:
The will, when written in conformity and compliance with the agreement, was a consideration which belonged to the appellee. The testator had no right to revoke it, and its attempted revocation, if deliberately made, constituted a fraud upon her. 199 Miss. at 347, 24 So.2d at 732.
We do not lay down a general rule allowing the establishment of a trust by oral agreement, nor do we design a model for all cases. We do say that where a testator executes a will in compliance with an oral agreement with the devisee that the *765 latter will render unique and necessary personal services to him involving a substantial change in the status and manner of living of the promisee, and such services have been performed, so that a revocation of the will amounts to fraud upon the latter, rendering it impossible or impracticable to restore him to the situation in which he was prior to the contract, equity will hold such will to be irrevocable and the rights thereunder may be established. 199 Miss. at 351-52, 24 So.2d at 734.
In comparing Kalavros and Tomme to this case, we observe there was no testimony that Carolyn rendered unique and necessary personal services to the Dauros which involved a substantial change in status and life style, nor did she establish that it was impractical for her to be restored to the situation prior to the alleged contract. As mentioned, Carolyn was a child in 1952 when the conversation occurred between the Dauros and her parents leading to the instrument through which she claims. Since initially, it was a unilateral promise, it was necessary for Carolyn to perform some service or act before the promise of the Dauros matured into a bilateral agreement irrevocably binding the Dauros to its terms.
Accepting the contentions urged by the complainant for the moment, and assuming but not deciding there was a promise by the Dauros to devise Carolyn the candy shop, it was revocable until it was accepted by Carolyn through her services in reliance upon the promise. See McGee v. Clark, 343 So.2d 486 (1977); Clinton Service Company v. Thornton, 233 Miss. 1, 100 So.2d 863 (1958); Griefield v. Gibraltor Fire and Marine Ins. Co., 199 Miss. 175, 24 So.2d 356 (1946), as well as Stonestreet v. Southern Oil Co., 226 N.C. 261, 37 S.E.2d 676 (1946), all to the effect that a unilateral promise is unenforceable or revokable until there is an acceptance by the promisee through performance or otherwise. The services performed by Carolyn were neither unique nor unusual, but were "every day" and ordinary and for which she was compensated, as found by the chancellor. Under these circumstances the revocation of the contract by Dauro did not "amount to fraud" upon the promisee as was the case in Tomme. Having been paid for her services there was no remaining obligation of the Dauros to leave their property to Carolyn.
We have often held that a chancellor's finding of fact will not be reversed unless it is manifestly wrong. Citation of authority would be superfluous on this point. However, we think some elaboration might be beneficial upon an often overlooked point, and that is, a judge's or chancellor's finding of fact is the equivalent of a jury's verdict upon conflicting evidence.
In Hall v. State, 247 Miss. 896, 157 So.2d 781 (1963), we held:
The decision of the trial judge merits the same consideration as a jury verdict, ...
The lower court judge, in this case, had sole authority for determining the credibility of the witnesses. Pate Lumber Co. v. Weathers, 167 Miss. 228, 146 So. 433. We have heretofore held that the findings of a court in such circumstances are entitled to the same weight as a jury verdict, Key v. Withers & Wellford, 159 Miss. 125, 131 So. 868, and we have further held that the findings of fact should not be disturbed unless they are manifestly wrong. Ellis v. S. Pellegrini, Inc., 163 Miss. 385, 141 So. 273; United States Fidelity Guaranty Company v. State, for use of Ward, 211 Miss. 864, 53 So.2d 11; McCallum v. Laird, 244 Miss. 273, 142 So.2d 32. 157 So.2d at 784.
We conclude the chancellor's finding that the complainant was compensated for her services, and did not carry her burden of proof in other regard, cannot be held manifestly wrong by this court since the record is not to the contrary.
The court's finding permeates the other contentions for reversal including the contention that the "mutual will" was not revoked by Mary Dauro because mutual wills are governed by the same general rules of *766 contracts. In Monroe v. Holleman, 185 So.2d 443 (Miss. 1966), we held the construction of joint and mutual wills, and the contract under which they are made, is governed by the rules relating to the construction of wills and contracts generally, including the rule that the situation of the parties and the surrounding circumstances are given consideration so as to determine the intention of the testators. In this case the chancellor found that Carolyn had been paid for her services to Mary and John Dauro, and although Mary did not expressly revoke the joint instrument of 1952, her demise did not add to or detract from it, because it was unenforceable for lack of consideration. McGee v. Clark, 343 So.2d 486 (1977); Clinton Service Company v. Thornton, 233 Miss. 1, 100 So.2d 863 (1958); and Griefield v. Gibraltor Fire and Marine Ins. Co., 199 Miss. 175, 24 So.2d 356 (1946). We therefore think this contention has no merit.
We are of the opinion the above conclusions are dispositive of this suit and for that reason the remaining assignments of error are without merit.
AFFIRMED.
SUGG, P.J., WALKER, P.J., and BROOM, ROY NOBLE LEE, BOWLING, DAN M. LEE and PRATHER, JJ., concur.
HAWKINS, J., dissents.
HAWKINS, Justice, dissenting:
With deference, I must respectfully dissent on issues of law as well as the Court's approval of the chancellor's finding of fact.
Carolyn Voss has attempted to establish her claim to real property against a deceased's estate. The law in this state cautiously requires that she establish her claim by evidence other than her own testimony. To this effect, Mississippi Code Annotated section 13-1-7 (1972), commonly referred to as the "dead man's statute," states:
A person shall not testify as a witness to establish his own claim or defense against the estate of a deceased person, which originated during the lifetime of such deceased person, or to establish any claim he has transferred since the death of such decedent. But such person so interested shall be permitted to give evidence in support of his claim or defense against the estate of a deceased person which originated after the death of such deceased person in the course of administering the estate. A person shall not testify as a witness to establish his own or assigned claim or defense against the estate of a person of unsound mind, which originated before the ward became a non compos mentis. But this shall not apply to claims or defenses which arose in the course of the administration of the estate of such person.
Certainly, this statute serves the useful purpose of discouraging fraudulent claims against the estate of the individual who cannot deny the claims made, while permitting legitimate claims which can be established by evidence other than the claimant's testimony. 81 Am.Jur.2d Witnesses § 304 (1976). The burden is sometimes difficult when one cannot explain his own position, yet the statute and case law prior to this opinion restricts the claimant only in his own testimony. Any other individual may testify on the claimant's behalf to establish a claim.
The best illustration of the limitations of the Mississippi dead man's statute is found in Herrington v. Herrington, 232 Miss. 244, 98 So.2d 646 (1957), wherein we upheld the establishment of the claim by the claimant's own spouse. We stated therein:
One of the assignments of error is that the trial court erred in permitting, over the objections of the complainants, the wife of L.T. Herrington, that is to say Alice Herrington, to testify as a witness. She did not testify to establish her own claim or defense against the estate of a deceased person, but rather to establish the claim of her husband, L.T. Herrington, to the land in question. We think that she was a competent witness. Id. at 247, 98 So.2d at 647.
See also Boggan v. Scruggs, 200 Miss. 747, 29 So.2d 86 (1947) (claim proved by the claimant's husband alone). Cf. Smith v. *767 Hinton, 349 So.2d 510 (Miss. 1977) (decedent's widow could testify to establish claim to insurance proceeds since decedent's exmistress, not the widow, was named as beneficiary in policy).
Carolyn Voss presented the testimony of six individuals to establish her claim to "Carolyn's Gift Shop." Of these six witnesses, only two were in Carolyn Voss' immediate family: Kay McCardle, her sister, and Ben Morreale, her father. Both Jean Cantrelle, who testified at the trial, and Mrs. Lois Welch, whose deposition was submitted, had been employed by the Dauros during the years that Carolyn Voss worked at the shop, and were not related to Mrs. Voss, insofar as this record reflects. Annie Morengo, a first cousin to Mrs. Voss, was the daughter of another sister of Mary Dauro. Vincent Dauro, whose deposition was also received into evidence, was John Dauro's brother and was related to Mrs. Voss only by marriage.
Vincent Dauro's testimony is perhaps the most convincing of all in that it reflects John and Mary Dauro's awareness of their obligation to devise the property to Mrs. Voss upon their death, and long after Mrs. Voss had stopped working at the shop. Vincent Dauro testified that years after Carolyn had left the shop, Vincent tried to persuade them to begin giving away their property. He testified that Mary spoke up and said, "Well, Vincent, we have agreed to give [Carolyn's Gift Shop] ... to Carolyn when we both pass away... ." John Dauro made the same statement, according to Vincent. After Mary died in 1968, John and Vincent were discussing their property again, and John said, "We already agreed to give this to Carolyn." Vincent also testified that John's reason for giving the property to Carolyn was that "[after she had worked] for him for that length of time, and that she helped them get started, that they started with little or nothing, and that she helped them get started, that they felt like she was entitled to something, and at the time that she started working for them, that they weren't able to pay her what they felt like she was worth."
All of these witnesses testified that they often saw Carolyn working in the gift shop after school and on weekends. They further testified that she was not compensated at that time, since John and Mary Dauro had intended that the gift shop would belong to Carolyn when they died. Their testimony was strongly reinforced by the instrument, later determined by the chancellor to be a will, as well as the blatant fact that the gift shop had been named after Carolyn.
Despite the clarity of everyone's understanding that Carolyn was to have the gift shop in return for her assistance to the Dauros, the chancellor's finding that Mrs. Voss was compensated turns solely on the testimony of Helen Weber, another employee and beneficiary under John Dauro's second will. Concerning the witnesses testifying on behalf of Carolyn Voss, the chancellor stated:
Although there were several witnesses who gave testimony to the effect that Carolyn Voss did work for the Dauros for an extended period of time with no pay, the Court is of the opinion that all of these witnesses have an interest in the outcome of this case either by relationship to the complainant or by similar claims of their own which have been pending before this Court. The only witness that testified who is neither related to nor has a claim against the Dauro estate is Helen Weber. Ms. Weber had been an employee of the Dauros during a portion of the time that the complainant was working for the Dauros. Ms. Weber was paid for her work and her testimony was that the complainant was also paid. While Helen Weber was a beneficiary of the will of John P. Dauro, the value of the estate is sufficiently large and she would receive her inheritance regardless of the outcome of this estate. (emphasis added)
The chancellor's refusal to consider the testimony of relatives is manifestly wrong, in my opinion. He states, in effect, that the relatives of Carolyn Voss are not credible witnesses since their kinship infers that *768 they have an interest in the outcome of the case. Their "interest", if any, is simply not borne out by the recorded testimony. Nothing in the record indicates that Carolyn Voss' relatives were to share interests in the gift shop property had Carolyn Voss succeeded in her claim, and we cannot attach that presumption to her relationship to her witnesses. Yet, the chancellor states, in essence, that their testimony was tainted by self-interest and, therefore, should not be considered.
This finding, aside from being unsupported by the record, does not bear close scrutiny under the Herrington decision, either. Herrington establishes the spouse of the claimant as a competent witness, even though no greater interest in the outcome of a claim of this sort can be inferred by such relation to a claimant. Even though the Herrington decision establishes the competency, as opposed to the credibility of the witness, it nonetheless indicates that the testimony of the claimant's witnesses should be weighed and considered regardless of the relationship to the claimant. In the case before us, the chancellor summarily dismissed the testimony of Carolyn Voss' relatives.
The chancellor further states that others testifying for Carolyn Voss were not credible because they had similar claims pending in his court against John Dauro's estate. It is entirely possible that the chancellor is aware of pertinent variables outside the record, but this Court should base its decision upon a review of that which is reflected in the record, not evidence which we surmise that the chancellor was aware of. Otherwise we cannot properly evaluate the errors assigned. Consequently, from the chancellor's statement that some of the witnesses have similar cases pending before the chancellor, I can only conclude that this factor is irrelevant. To conclude otherwise would, in my opinion, establish dangerous precedent. The majority has put its stamp of approval on a new rule of evidence, namely: A witness who has a similar claim cannot be a credible witness in the case before the court.[1]
Turning now to this Court's finding that the services performed by Carolyn Voss were not unique and necessary personal services, I must again voice my dissent. The chancellor did not mention this aspect of the case in his opinion, but the majority states that there is nothing in the record to indicate that the services were anything but "every day and ordinary." In my view, the majority has emphasized the wrong aspect of the services rendered by Carolyn Voss and has brushed aside the pertinent circumstances which made her services unique to this childless couple.
It is true that the magical words "unique personal services" were never used in the record with reference to the services performed by Carolyn Voss. Certainly, her tasks about the shop were perhaps menial and mundane. Most anyone, even a child, could have performed the duties required of Carolyn during the years that she worked for her aunt and uncle. And yet, Carolyn herself was unique, in that John and Mary Dauro were quite attached to her. The couple had no children of their own, and Carolyn filled this void. Carolyn was indeed like a daughter to John and Mary Dauro. Not only did they name the shop *769 after Carolyn, but they were obviously quite protective of her. Otherwise, they would not have been so upset when Carolyn dated a boy whom they disapproved of. In short, John and Mary Dauro simply wanted the company of this little girl, Carolyn Morreale Voss, their godchild and niece.
I can only speculate on the treasure of this little girl's company to this couple. But I am certain that John and Mary Dauro got everything they bargained for.
Not only were the services unique for the reasons stated above, but the services proved advantageous to the establishment of John and Mary Dauro's business. John Dauro, himself, recognized this fact in his conversation with Vincent Dauro, his full brother, years later. Again, Vincent testified that John and Mary's reason for giving the property to Carolyn upon their death was that Carolyn had helped them get started at a time when they had little or nothing. She worked for a considerable length of time, and they were not then able to pay her what she was worth. Perhaps Carolyn was nominally compensated, but John Dauro had been satisfied with her work and continued to consider himself bound by the agreement.
The majority further does not believe that the services performed by Carolyn to John and Mary Dauro involved such a substantial change in the status and manner of living of Carolyn that a revocation of the will would amount to fraud, rendering it impossible or impracticable to restore her to her situation prior to the contract. I strongly disagree.
Carolyn Voss gave up countless hours of her free time after school and on weekends for seven years to work in the shop under the assumption that the shop would one day be hers. This kind of promise is sufficient to induce almost any enterprising young child or teenager to give up social activities as well as time spent with friends at that age. These activities were all sacrifices which Carolyn had to make and which she would never have the opportunity to participate in again. It also probably affected her school work. These sacrifices were made under the belief that she was investing in her future.
I can only wonder whether our decision today is swayed by our adult detachment from those activities which we, too, once treasured as children. Our application of the law in this regard must reflect the relativity of each individual's interests and sacrifices, whether made by a child or an adult. In my view, the services and the change in life style made by Carolyn Voss are no different from the unique services performed and recognized in our earlier cases. See Denson v. Denson, 203 Miss. 146, 33 So.2d 311 (1948) (father offered compensation through his will to anyone of his sons who could take hold of farm land and work him out of debt); Johnston v. Tomme, 199 Miss. 337, 24 So.2d 730 (1946) (claimant cared for a paralytic two and one-half years until his death).
In summary, the reasons stated by the chancellor for not considering the complainant's witnesses regarding the compensation for Carolyn Voss' services were unsupported by the record. In my view the fact that Carolyn was not fully compensated, if indeed compensated at all, is overwhelmingly supported by unbiased testimony which should have been carefully examined. For this reason, the instrument found by the chancellor to be a will could not be revoked by either John or Mary Dauro for lack of consideration. The couple received everything they had bargained for. Since both parties had performed, Carolyn by her services, and the Dauros by the execution of the will, this Court should have recognized the execution of the oral contract as we have done in the past. Johnston v. Tomme.
The execution of the oral contract having been established by the performance of both parties, the 1952 will, executed pursuant to the contract, should therefore be recognized and upheld by this Court, and as irrevocable by John and Mary. As between all the parties in this litigation, the 1952 will should be established as the last will and testament of John and Mary, with the 1973 instrument of John as a lawful codicil thereto.
*770 Of course, the 1952 will is subject to the statutory mandate to probate in either common or solemn form as appellant should choose, and would be subject to challenge by any person who was not a party to this case.
Finally, the 1952 will, together with the 1973 codicil, would still need to be construed by the chancellor to determine the property described and intended to be devised in the 1952 will, and what property remains to pass under the codicil.
For the reasons stated, I would reverse and remand for proceedings consistent with the views stated herein.
NOTES
[1] Mary Dauro died on April 8, 1968, and John died August 1, 1979.
[2] The property was conveyed to the Dauros "as an estate in entirety with the right of survivorship and not as tenants in common" on January 10, 1952.
[3] The record establishes that John Dauro was an astute and successful businessman, though he could neither read nor write, with the exception of his name. Mr. Morreale testified that after Mary wrote the instrument, it was read to John and he approved it.
[4] Mrs. Weber, a legatee under John Dauro's 1973 will, testified that Carolyn was paid weekly as she had been, though she did not know how much. Others, testifying for Carolyn, including John's brother, stated that she had not been paid since the shop would be hers upon the Dauros' death. The chancellor considered Mrs. Weber's statements to be more accurate, since the estate was sufficient to cover her $10,000 bequest without the property in question. See Herrington v. Herrington, 232 Miss. 244, 247, 98 So.2d 646, 647 (1957), (spouse of claimant is competent to establish claim against estate, since not establishing his or her own claim).
[1] 81 Am.Jur.2d Witnesses § 354 (1976) states that even coparties may testify on each other's behalf if their interests are several rather than joint, as follows:

Under a statute precluding a party to an action by or against a personal representative from testifying for himself concerning transactions and communications with the deceased, where an action is by or against two or more coparties whose interests are several rather than joint, one such coparty may testify in favor of other parties to the action, although not in favor of himself. A personal representative cannot, by making a person a party of record, deprive the adverse party of his testimony where, as between the representative and the adversary, the witness does not testify for himself. If, however, the parties are jointly interested in defeating an action, a party's testimony as to a defense will ordinarily be regarded as for himself and within the prohibition of the statute.
The instant case does not even reach this level of concern, yet the chancellor disregarded the complainant's testimony because they had filed similar claims.