C. C. SHACKELFORD v. NEW ORLEANS, JACKSON, AND GREAT NORTHERN RAILROAD COMPANY.

1. EVIDENCE: CUSTOM.—Before evidence of a particular custom can be admitted to explain a contract, it must be shown that the custom is established, existing at the time and place of the transaction, and known to the parties; it must also be certain, uniform, reasonable, and not contrary to law.

2. SAME: HOW CUSTOMS PROVEN.—Customs and usages must be proven by evidence of facts, and not by mere speculative opinions; and by witnesses who have had frequent and actual experience of the custom or usage about which they depose.

3. RAILROADS: POWERS AND DUTIES OF DIRECTORS.—The powers and duties of

railroad directors, when there is no provision in the charter or by-laws of the company regulating the subject, are confined to their action at the meetings of the board, and they have, therefore, no power, and are under no obligation to act in their individual capacity for the company.

4. SAME: SAME: RIGHT OF DIRECTOR TO COMPENSATION FOR SERVICES DONE THE COMPANY.—By resolution of the board of directors, a single director may be empowered to transact any business or agency for and on behalf of the corporation, and if there be no agreement, express or implied, to the contrary, the law will imply a contract between the company and the director accepting such agency, that he shall receive a reasonable compensation for his services.

ERROR to the Circuit Court of Madison county. Hon. E. G. Henry, judge.

The defendants in error brought this action against the plaintiff in error to recover $1610, which they alleged that he had collected and received for their use.

The plaintiff in error (defendant below) relied, at the trial, upon a plea of payment. To support this plea, he introduced evidence to show, that during the ·years 1855 and 1856, he being then a director in plaintiffs' company, collected money for the plaintiffs; that he bought depot grounds for them; made contracts for the transportation of the iron and locomotives of the company over the Vicksburg and Jackson Railroad; that he settled differences between the contractors of the company and the proprietors of land on which the road was being constructed, and made satisfactory arrangements with said owners in relation to cattle guards, &c.; that he settled several complicated accounts with the agents and contractors of the company.

It was also shown that the Jackson and Canton Railroad Company had transferred their property to the defendant in error, and that it was a part of said contract of transfer, that defendants in error should issue certificates of their stock to the subscribers for stock in the Canton and Jackson Railroad Company, whenever their payments would make even shares, at $25 dollars each; and defendants in error also bound themselves to complete the road from Canton to Jackson by 1st November, 1854, or forfeit certain valuable privileges secured by the contract of transfer. Defendant proved that he settled the stock accounts of many of the

stockholders in the Canton and Jackson Railroad Company, and made collections from them to make even shares; and that on three occasions it was necessary to procure from the stockholders, in the Canton and Jackson Railroad Company, their written consent to an extension of the line for the completion of the road from Jackson to Canton; and that he acted at the request of defendants, and with others succeeded in procuring such consent. Defendant also showed resolutions of the board of directors, and letters from the president, of the plaintiff, authorizing and requesting him to do these things.    He proved the value of these services to be about $2000.

The plaintiff then, in rebuttal, introduced W. Goodman, who testified that he was president of the Mississippi Central Railroad Company; that the president of a railroad company, being its executive officer, and having his whole time engaged about its business, received a salary; that the salary of the president of the Mississippi Central Railroad Company was at first $1000, then $1500, then $2000, and is now $3000 per annum; that the duties of a director of a railroad company was generally prescribed by its charter or by-laws; that he regarded directors as trustees for the stockholders, and that it was their duty to attend to the interest of the stockholders and the company generally; that a director had no power to act except at the meetings of the board, but could be authorized to perform certain acts by resolution of the board; that a director could act as a committee, but his acts must be submitted to the board for ratification; that every director should look after the interests of the company in his own locality, and also in any place where he might happen to be, and if he sees anything amiss in the conduct of the employees of the company, he should have it corrected; that a director cannot contract on behalf of the company, but could agree on terms of contract.

Witness also stated, that obtaining the assent of stockholders to an extension of time for the completion of the road; that the making or agreeing on a contract for the transportation of the company's iron; that the purchase of land for a depot; that the delivery of certificates of stock to stockholders in his own vicinity; that the settlement of difficulties between the owners of land on which the road was located, and the employees and contractors of

the company, were all clearly within the duties of a director, and for which he should receive no pay; that there was an implied contract on the part of a director, when he accepted the office, that he would perform all the duties pertaining to his office without charging therefor; that receiving money for the company, and superintending its clerks while arranging books and stating accounts, were not duties of a director; that if extra official duties were required of a director he should be paid, but the amount of his compensation should be fixed at the time; that resolutions of the board frequently requested directors to perform certain services within the line of their duties as directors, as that was the only mode of giving them the authority to act separately.

E. D. Frost, for plaintiff, testified that he had never been a director of a railroad company, but had been a superintendent for several years, and he concurred with Goodman as to the duties of a director.

W. Lyons had been a director in plaintiff's company. He also concurred with Goodman.

A. J. McKee had been a contractor on plaintiff's road, and he also concurred with Goodman.

Joseph R. Davis testified, that he was then a director in the Mississippi Central Railroad Company; that the duties of directors included everything pertaining to the interest of the company; and that it was not customary for them to receive pay; that he would not charge his company for receiving money from a bank or the treasurer of a county, and handing it over to one authorized to receive it; that if he were required, as a lawyer, to collect money for his company, he should charge for it; that he would not charge for making a contract with another company for the transportation of iron, nor would he charge for purchasing land for depot purposes.

To all this evidence of Goodman, Frost, Lyons, McKee, and Davis, defendant objected, but his objections were overruled.

The defendant then, in reply to this proof, proposed to read, from the depositions of Harrison and Cole, their opinion as to his right to compensation, but this testimony was excluded.

The jury found a verdict for the plaintiff, for all that was sued for, allowing defendant about $150 for his services.

The defendant moved for a new trial, which was refused. He excepted, and sued out this writ of error.

*Lawson* and *Fearn*, for plaintiff in error,

Cited 15 Barbour R. 324 ; Ang. & Ames on Corp., §§ 317, 318; *Chandler* v. *Monmouth Bank*, 1 Green's (N. J.) R. 255 ; 6 S. & M. 231 ; *Salem Bank* v. *Gloucester*, 17 Mass. 28 ; 27 Vermont R. 435; 19 Ib. 425; *Bank of U. S.* v. *Davis*, 2 Hill's N. Y. R. 461 ; 3 Ib. 274.

*T. C. Tupper*, for defendant in error,

Cited Ang. & Ames on Corp., § 12, p. 255 (2d edit.) ; Ib. 253 ; *Dunston* v. *Imperial Gas Company*, 3 B. & Adolph. 155 ; *Hall* v. *Vermont and Massachusetts R. R. Company*, 28 Vermont R. 409.

HARRIS, J., delivered the opinion of the court.

This was an action for money had and received, commenced by the defendants in error against the plaintiff in the court below.

A general denial and payment were relied on in the answer, and issue was joined on their answers, and jury and verdict for the defendants in error. On the trial, the main subject-of inquiry was, whether the plaintiff in error was entitled to compensation for certain services performed by him for the defendants in error; and if so, how much ? The record shows that the plaintiff in error was a director in the company of defendants in error at the time the services, for which he claims compensation, were rendered. And the defendants in error introduced several witnesses to prove the custom of railroad companies, as to the duties of directors and their compensation ; this evidence was objected to by plaintiff in error, but admitted by the court, which constitutes the first ground of error assigned.

It is admitted, that neither the charter of defendants in error, nor their by-laws, presents any rule on this subject.

In the case of the *Schooner Reeside*, 2 Sumner, 567, Judge Story thus expresses himself on this subject : " I own myself no friend to the almost indiscriminate habit, of late years, of setting up particular usages or customs, in almost all kinds of business and trade,

to control, vary, or annul the general liabilities of parties under the common law, as well as under the commercial law. It has long appeared to me, that there is no small danger in admitting such loose and inconclusive usages and customs, often unknown to particular parties, and always liable to great misunderstandings and misinterpretations and abuses, to outweigh the well-known and well-settled principles of law. And I rejoice to find that, of late years, the courts of law, both in England and in America, have been disposed to narrow the limits of the operation of such usages and customs, and to discountenance any further extension of them. The true and appropriate office of a usage or custom is, to interpret the otherwise indeterminate intentions of parties, and to ascertain the nature and extent of their contracts, arising not from express stipulations, but from mere implications and presumptions, and acts of a doubtful or equivocal character."

"It may also be admitted to ascertain the true meaning of a particular word, or of particular words in a given instrument, when the word or words have various senses, some common, some qualified, and some technical, according to the subject-matter to which they are applied."

We fully concur in the just views so expressed by Justice Story. The foundation of this whole doctrine of usage or custom, when applied to the dealings of men, is, that they are presumed to deal with each other, in reference to the known customs which have immemorially prevailed, either in that particular locality or everywhere, in relation to the subject of their dealings, and they are, therefore, presumed to intend that such custom shall be the law of their action. It must be an established custom, existing at the time and place of their dealing, and known to the parties. It must be certain, uniform, reasonable, and not contrary to law. 2 Greenleaf's Evid. 273, § 251, and numerous cases cited.

"These usages, many judges are of opinion, should be sparingly adopted by the courts as rules of law, as they are often founded on mere mistake, or on the want of enlarged and comprehensive views of the full bearing of principles. Their true office is to interpret the otherwise indeterminate intentions of parties, and to ascertain the nature and extent of the contracts arising, not from express stipulation, but from mere implications and presumptions, and acts

of a doubtful and equivocal character, and to fix and explain the meaning of words and expressions of doubtful or various senses. On this principle, the usage or habit of trade, or conduct of an individual, *which is known to the person who deals with him*, may be given in evidence to prove what was the contract between them." 2 Greenleaf's Ev. § 251, and note 5.

Both customs and usages must be *proved by evidence of facts*, not of mere speculative opinions, and by witnesses who have had frequent and actual experience of the custom or usage, and do not speak from report alone. Ib. § 252.

And to the same effect are the authorities cited in the briefs of counsel.

Tested by these rules, the evidence of Goodman and others, as to their opinions of the duties and responsibilities of directors, were clearly inadmissible. Indeed, Mr. Goodman nowhere pretends to prove a custom or usage of any character. Upon the subject of his own compensation as president, instead of proving a custom or usage, he proves, to the contrary, that it has varied from $1000 to $3000. And the rest of his testimony is nothing but the expression of his opinion as to the law of railroad directors and agencies; and the witnesses, Frost, McKee, and Davis, confirm the opinions of Goodman. This assignment of error was therefore well taken.

The second assignment of error relates to the rejection of the testimony of Harrison and Cole, by whom it was proposed to prove their opinion of the right of the plaintiff in error to compensation for his services.

We think this testimony was rightly excluded; as also all testimony as to what other special agents of the company had been paid for particular services.

It is next insisted that the instructions given for the defendants in error were erroneous. And the second instruction given for the defendants in error is particularly referred to, as asserting or intimating that a director of a railroad company is bound to act as its agent without compensation.

In the absence of charter regulations or by-laws fixing the duties of directors of a railroad company, they are without authority or power to act, in their individual character, for the corporation, as much as any stockholder. These powers and duties are conferred

to their action at the meetings of the board. By resolution of the board they may be empowered to transact any business or agency for or on behalf of the corporation. And unless there is some agreement or understanding, express or implied, from the circumstances attending such appointment or agency to the contrary, the law will imply a contract on the part of such company with their agent, whether he be a director or a stranger, that he shall receive, for such service in the business of such agency, whatever compensation he reasonably deserves to have therefor. And on proof of the value of his services, the jury should find accordingly.

It is evident, from the testimony in this cause, that the jury must have proceeded upon the idea that, as the plaintiff in error was a director, he was bound to serve the company without compensation in business not pertaining to the meetings and action of the board in session. This was a misconception of the law, resulting in gross injustice to the plaintiff in error.

Let the judgment be reversed, cause remanded, and a *venire de novo* awarded.

HANDY, J., being interested as a stockholder in the railroad company, did not sit in this case.