587 So.2d 273 (1991)
Thomas F. PUCKETT and Mildred M. Puckett
v.
RUFENACHT, BROMAGEN & HERTZ, INC.
No. 90-FC-1321.
Supreme Court of Mississippi.
September 18, 1991.
Dissenting Opinion October 2, 1991.
*274 Fred Krutz, Alan W. Perry, Forman, Perry, Watkins & Krutz Firm, Jackson, for appellants.
William J. Nissen, Sidley & Austin, Chicago, Ill., Carey R. Varnado, Easterling & Varnado, Hattiesburg, for appellee.
Joseph P. Wise, Wise Carter Child & Caraway, Jackson, for amicus curiae.
En Banc.
Dissenting Opinion of Justice Pittman October 2, 1991.
HAWKINS, Presiding Justice, for the Court:
Under the provisions of Rule 20 of the Mississippi Supreme Court Rules, the United States Court of Appeals, Fifth Circuit, has by certificate of November 14, 1990, certified questions of law to this Court following its decision in Puckett v. Rufenacht, Bromagen & Hertz, Inc., 903 F.2d 1014 (1990).
From these we take extended excerpts.
This case arose out of the commodity futures trading tragedy of Dr. Thomas F. and Mrs. Mildred Puckett. The United States District Court for the Southern District of Mississippi granted summary judgment in favor of Rufenacht, Bromagen & Hertz, Inc. (RB & H), the broker, on all counts below. The Court of Appeals affirmed the summary judgment dismissing the Pucketts' claims that RB & H committed common law fraud or violated § 4b of the Commodity Exchange Act (CEA), 7 U.S.C. § 6b. However, it certified the state law questions of negligence and breach of fiduciary duty to the Supreme Court of Mississippi.

FACTS
Read in the light most favorable to the Pucketts, RB & H, a Chicago-based commodity brokerage firm, operates a branch office in Hattiesburg, where the Pucketts reside. Dr. Puckett is a retired pathologist who successfully ran his own pathology lab in Hattiesburg, with gross revenues of $8,000,000 per year.
Dr. Puckett had continuously traded some form of securities from 1955-56 to 1984. He had previously traded commodities on two occasions. He traded with Merrill Lynch in the late 1950's or early 1960's and lost about $40,000. He also traded for a couple of weeks with Paine Webber in mid-1984 and lost about $1,000.
The Pucketts learned of RB & H in July, 1984, at a dinner party. Roger Parker, the manager of the Hattiesburg branch of RB & H, made a presentation about trading commodities in order to acquire customers. Both of the Pucketts opened accounts. They filled out applications on which they stated the amount of risk capital available for commodities trading as $25,000 (for Dr. Puckett) and $15,000 (for Mrs. Puckett). Both Dr. and Mrs. Puckett signed Risk Disclosure Statements before they traded. Both Pucketts acknowledged by signing that they "examined this document and underst[ood] fully the advice contained therein."
These statements informed the Pucketts of the substantial risk in futures tradings, containing the following language:
The risk of loss in trading commodity futures contracts can be substantial. You should therefore carefully consider whether such trading is suitable for you in light of your financial condition. In considering whether to trade, you should be aware of the following:
(1) You may sustain a total loss of the initial margin funds and any additional funds that you deposit with your broker to establish or maintain a position in the commodity futures market. If the market moves against your position, you may be called upon by your broker to deposit a substantial amount of additional margin funds, on short notice, in order to maintain your position. If you do not provide the required funds within the prescribed time, your position may be liquidated at a loss, and you will be liable for any resulting deficit in your account.

*275 (2) Under certain market conditions, you may find it difficult or impossible to liquidate a position. This can occur, for example, when the market makes a "limit move."
(3) Placing contingent orders, such as a "stop-loss" or "stop-limit" order, will not necessarily limit your losses to the intended amounts, since market conditions may make it impossible to execute such orders.
(4) A "spread" position may not be less risky than a simple "long" or "short" position.
(5) The high degree of leverage that is often obtainable in futures trading because of the small margin requirements can work against you as well as for you. The use of leverage can lead to large losses as well as gains.
This brief statement cannot, of course, disclose all the risks and other significant aspects of the commodity markets. You should therefore carefully study futures trading before you trade.
(R. 248, 253)
The Pucketts' accounts were non-discretionary. In other words, they made all the trading decisions themselves[1]  RB & H could not make unauthorized trades on their behalf. Dr. Puckett spent several days each week at RB & H's offices where he used a quote machine and a news service provided on a screen. He also received comments from the floor of the Chicago Mercantile Exchange. Dr. Puckett regularly received statements (confirmation slips and monthly account statement) which he reviewed.
According to his own deposition testimony and affidavits, Dr. Puckett understood the risks of trading commodity futures contracts. (R. 223-5) Dr. Puckett knew that a risk accompanied every trade and that he had to incur this potential risk in order to reap the potential rewards of large gains. (R. 211-12) Dr. Puckett understood that while some contracts had daily price limits (i.e. limits on how far up or down they could move in a single day), others had no limits and the risk of loss each day on such contracts was unlimited. (R. 221-23) He knew that the potential loss on the Standard & Poors 500 Stock Index Contract (S & P Index) was unlimited. (R. 222-23) Initially, Dr. Puckett was unaware of how quickly the S & P 500 Index could move in a day, but he became aware of this risk when he lost $65,000 trading this contract in one day. (R. 223-24) He continued to trade this contract after learning of this risk. Id.
Dr. Puckett had both successful and unsuccessful trades throughout the thirty-eight months he traded with RB & H. Parker testified that he never tried to influence Puckett in his choice of trades. Dr. Puckett agreed and testified that the initial idea for each of his trades was his own. Parker always properly carried out Dr. Puckett's orders. Puckett could not identify any statements made or information provided by Parker which was untrue. (R. 203) Dr. Puckett believed that any advice which Parker gave about trades was in good faith, even if it didn't pan out. (R. 204) A sampling of Dr. Puckett's deposition reads:
Q. Now, when you did incur losses in your account at RB & H, you were aware of those losses on the day they occurred; is that correct?
A. Yes.
Q. And it was your decision to continue to trade each day after that; is that right?
A. Yes.
Q. And you understood, didn't you, the risk that went along with each particular trade you did?
MR. KRUTZ:
Object to the form of the question. You can answer it, though.
A. Yes.
Q. And you also understood with each trade there was a potential profit that could be made on that trade; is that right?

*276 A. Yes.
* * * * * *
Q. It's true isn't it, that when you made a trade, you knew there was both a potential risk and a potential reward to that trade?
A. Yes.
Q. So, in order to obtain the potential reward, you knew you had to incur that potential risk; is that right?
A. That's right.
(R. 210-212)
The initial risk figures of $25,000 and $15,000 which the Pucketts listed in their customer applications became unimportant to Dr. Puckett once he began trading and he decided to risk more money as time went on. (R. 212, 236) As noted, Dr. Puckett knew his losses on the day they were incurred. (R. 210-211) He generally covered those losses with a check that afternoon or the next morning. (R. 206) Dr. Puckett occasionally liquidated securities at another firm to cover his losses. On those occasions, RB & H always waited the five days it took the security transaction to clear before cashing his check. Eventually, Dr. Puckett began liquidating his pension plan to cover his commodity trading losses. The checks did not indicate the source of funds and Dr. Puckett never informed Parker that he was funding his losses by liquidating his pension fund. (R. 225, 235-38, 629-54)
Dr. Puckett knew that RB & H received a commission for each trade he made. His monthly account statements showed those amounts. (R. 202)
Dr. Puckett quit trading in September, 1987, on the advice of his son. His accountant had informed his son of the state of Dr. Puckett's finances. Dr. Puckett's son told him to stop. By this time, Dr. Puckett had lost over $2,000,000. (R. 229-30) Dr. Puckett told Parker he was quitting because he had lost enough. He made no complaints about the way his account was handled and promptly paid his last loss. (R. 204-05, 214)
Thereafter, the Pucketts brought suit to recover trading losses, punitive damages and attorneys' fees. Their complaint was based on the following counts and allegations:
(i) violation of § 4b of the CEA, 7 U.S.C. § 6b,
(ii) breach of fiduciary duty,
(iii) fraudulent inducement, fraudulent concealment, and actual fraud,
(iv) constructive fraud,
(v) negligence,
(vi) breach of good faith and fair dealing and the just and equitable principles of trade, and
(vii) overreaching that was tantamount to fraud.
In response to RB & H's motion for summary judgment, the Pucketts submitted (by affidavit and deposition) the testimony of three expert witnesses (Jordan, Cullen and Giacona) expressing their opinion that Dr. Puckett traded too many different commodities, that he was not adequately informed and experienced to trade S & P futures contracts, that his trading volumes were so high as to be irrational, that he had no trading plan, and there was an extremely high probability that he would lose all he had if he was allowed to continue trading. The experts expressed their opinion that industry standards required a commodities broker to intervene to advise or require a customer such as Dr. Puckett to discontinue trading commodities. According to the experts, by the time RB & H allowed Dr. Puckett to trade S & P futures, Dr. Puckett had already demonstrated that he was unfit to trade any commodity futures, much less S & P futures. The experts concluded that RB & H's actions in permitting and encouraging Dr. Puckett's continued trading  after he had lost substantial sums of money and after RB & H should have recognized the facts demonstrating his unsuitability to trade commodities  violated standards of conduct and the minimum standard of care generally recognized and accepted in the commodities industry.
The trial judge held for RB & H on each of these counts and dismissed the Pucketts' suit with prejudice.
*277 On appeal, the Pucketts argued that genuine issues of material fact remain to be resolved. The three issues they raised were:
(i) fraud and a violation of CEA § 4b,
(ii) breach of fiduciary duty, and
(iii) negligence.
The Court of Appeals affirmed the trial court's disposition on the fraud issues and certified the following question of state law to this Court:
1. Under Mississippi law, what duty of care does a commodities broker owe to a commodities customers in a non-discretionary account?
(a) is the duty only properly to execute trades as directed by the customer, or
(b) is the commodities broker required to exercise that degree of care which a commodities broker of ordinary professional skill and prudence would exercise under similar circumstances?
2. Under Mississippi law, does a fiduciary duty exist between a commodities broker and a commodities customer with a non-discretionary account? If so, does that duty extend to require a commodities broker to:
(a) advise a customer to discontinue trading if the commodities broker knows or has reason to know that the customer is trading excessively and irrationally, or
(b) that the customer lacks the experience and ability to trade the commodities which he is trading, or
(c) that the customer has already incurred losses which are very high in proportion to the customer's net worth, so that there is a high probability that the customer will lose his entire net worth if he continues to trade commodities, or
(d) is such duty affected where the customer initiates the ideas for the trades, presumably understands the risks and potential rewards of the trades, directs the broker to execute the trades, and does not ask the broker is there a duty to determine and monitor whether the trades are suitable for the customer?
If, under Mississippi law, there is such a duty of care, is it subject to the doctrine of assumption of risk?
The Supreme Court of Mississippi is not bound by the phrasing of the questions certified.

LAW
The application of Rule 20 must be kept within well-defined ground rules. First, this Court is not called upon to decide the case. Nor should we go behind the facts presented by the certifying court. If either party has any objection to the facts related by the certifying court, the place to voice the objection is with that court, not us. We must understand the facts precisely as the certifying court understands them. Then, from the facts as understood and related by the certifying court, we are asked to make a more assured declaration of the law, when applied to the particular facts as related to us, than the certifying court feels it can comfortably pronounce. Boardman v. United Services Auto Ass'n., 470 So.2d 1024, 1029-1031 (Miss. 1985).
From the facts related by the Court of Appeals, the following is uncontradicted:
1. In 1984 at a dinner party attended by the Pucketts, there was a sales pitch by Parker, a representative of RB & H, on futures trading.
2. At that time Dr. Puckett could be accurately characterized as a good businessman with some experience in securities investment and futures trading.
3. The Pucketts were warned before engaging in futures trading by RB & H by a written statement, signed and understood by them, of the substantial risk they were undertaking in futures trading.
4. No person attempted to sell the Pucketts any futures. No person sought to induce them to enter into any of the great number of futures contracts they entered from 1984 until September, 1987, when Dr. Puckett ceased trading in futures. See: Dean Witter Reynolds, Inc. v. Hammock, *278 489 So.2d 761 (Fla.App. 1986), for case where investor was misled by his broker.
5. The Pucketts were not asked to trust or put any faith in any employee of RB & H, except to carry out Dr. Puckett's instructions.
6. Dr. Puckett knew his wins and losses each day.
7. Each transaction, each trade in which RB & H was the broker, and there were perhaps hundreds of them, was a separate and distinct contract. The only interest RB & H had in any of these contracts was that of a broker, receiving a commission from each transaction.
In sum, Dr. Puckett's trading objective was to make profits as a speculator in the commodity markets. He never asked Parker whether particular trades or particular trading strategies were suitable for him in terms of his age, financial needs and investment objectives. Nor did Dr. Puckett ever ask Parker for advice on where he should get the funds to use for trading commodity futures, or whether he should lessen his trading at RB & H. Dr. Puckett neither asked for nor was he given any advice or counseling on his trading tactics and strategies, nor is there anything in the related facts suggesting that he ever expected to receive any advice on the wisdom of any trade.
The only sin the defendants can be accused of committing is standing by while Dr. Puckett committed fiscal hara-kiri. It is equally clear and uncontradicted that no representative of RB & H uttered one word of warning or caution as to any of his trades. In view of the Jordan, Cullen and Giacona affidavits, and for purposes of our analysis, we will assume RB & H had reason to believe Dr. Puckett was, at times at least, trading quite foolishly.
The crux of the inquiry to us is whether RB & H can be held liable to the Pucketts under the common law of this State based upon Parker's and its total silence and passivity during Dr. Puckett's protracted self-immolation.
One word encompasses all the grandeur and majesty of western civilization. That word is "freedom." This, of course, is well known to any student of history. Not as well recognized, but equally true is that the absolute concomitant of freedom is responsibility; the former cannot exist unaccompanied by the latter. They are different sides of the same coin.
The laws of the universe do not forgive mistakes. Every cause must have certain effects. Whether motivated by the best or worst intention, a decision is going to have certain consequences. If it was a mistake, someone must suffer.
If a society is to be free, it must demand of every person who, completely on his own, makes a mistake that he has no legal right to shift from his shoulders onto another's the suffering it causes. In our modern society, en masse we are our brothers' keepers; we pay taxes for schools, highways, public health and hundreds of other public programs. On an individual basis, however, no man should be required by law to pay for what was solely and purely another man's mistake.[2]
It may be morally reprehensible for one man to watch another open a window on the twentieth floor of a skyscraper, climb through it and jump out, when he could easily have reached out and stopped him. To impose a legal responsibility upon the bystander to stop him, however, is an entirely different matter.[3]

THE PUCKETTS' ACCOUNT
The Pucketts' account with RB & H was a non-discretionary account.
*279 A discretionary account is one in which the broker himself on behalf of the investor customer makes and enters into futures contracts. A non-discretionary account is one in which by definition, the broker is only expected to faithfully carry out the instructions of the customer.
From other jurisdictions, certified question 1(a) is generally recognized as the only duty imposed upon a commodities broker on a non-discretionary account.[4]Leib v. Merrill Lynch, Pierce Fenner & Smith, Inc., 461 F. Supp. 951, 953 (E.D.Mich. 1978); Gochnauer v. A.G. Edwards & Sons, Inc., 810 F.2d 1042, 1049 (11th Cir.1987); First Union Brokerage v. Milos, 717 F. Supp. 1519, 1526 (S.D.Fla. 1989); Platsis v. E.F. Hutton & Co., Inc., 642 F. Supp. 1277, 1308 (W.D.Mich. 1986); Merrill Lynch, Pierce, Fenner & Smith v. Perelle, 356 Pa.Super. 165, 183-184, 514 A.2d 552, 561 (1983).
Certified question 1(b) is the generally recognized duty a commodities broker owes a customer in a discretionary account. Leib, 461 F. Supp. at 953; Howell v. Freifeld, 631 F. Supp. 1222, 1224 (S.D.N.Y. 1986); Paine Webber, Jackson & Curtis, Inc. v. Adams, 718 P.2d 508, 515 (Colo. 1986).
By its very nature, a broker in a discretionary account is a fiduciary in his treatment of his customer's funds to properly advise and properly invest. On the other hand, while a broker in a non-discretionary account as his customer's agent obviously has a fiduciary duty to properly carry out his customer principal's instructions, ordinarily his fiduciary duty ends there. He has no further duty to advise or counsel as to the wisdom of his customer's trades. Paine, Webber, Jackson & Curtis v. Adams, 718 P.2d 508, 514-516 (Colo. 1986); Leib, 461 F. Supp. at 953.
Under the general law from other jurisdictions, the answer to the first question is that a commodities broker in a non-discretionary account only owes his customer the duty to properly execute trades as directed by him, and has no further duty to call upon his own professional skill and prudence as to the wisdom of any of his customer's trades. Leib, 461 F. Supp. at 953; Gochnauer, 810 F.2d at 1049; Milos, 717 F. Supp. at 1526; Platsis, 642 F. Supp. at 1308; Perelle, 356 Pa.Super. at 183-184, 514 A.2d at 561.
Likewise, from other jurisdictions, the commodities broker has none of the fiduciary duties encompassed in the second certified question to a non-discretionary account customer. Leib, 461 F. Supp. at 953; Gochnauer, 810 F.2d at 1049; Milos, 717 F. Supp. at 1526; Platsis, 642 F. Supp. at 1308; Perelle, 356 Pa.Super. at 183-184, 514 A.2d at 561.
We believe the decisions from other jurisdictions are sound and their pronounced principles should apply in this state as well. Dr. Puckett over a period of several years no doubt entered into several hundred futures contracts, each of them separate and distinct. Leib, 461 F. Supp. at 952-953. He gave instructions to RB & H. RB & H in turn entered into the contract precisely as instructed, and charged its commission. Having done so, its contractual duty to Dr. Puckett ended there. It was not legally required to offer an umbrella of professional wisdom between contracts, detect a pattern, and advise him as to any futures trade. Nothing in the related facts suggests that RB & H entered into any kind of contractual obligation to professionally advise or warn Dr. Puckett in any way, or that Dr. Puckett understood RB & H to have such an obligation. We adopt as sound the following holdings from Robinson v. Merrill Lynch, Pierce, Fenner & Smith, 337 F. Supp. 107, 111 (N.D.Ala. 1971), aff'd Robinson v. Merrill Lynch, Pierce, Fenner & Smith, 453 F.2d 417 (5th Cir.1972):
The agency relationship did not arise until the plaintiff placed an order, since defendant did not have discretionary or managerial power over plaintiff's account and therefore had no authority to *280 act for the plaintiff without express direction. [citations omitted]
A broker's office, without special circumstances not present here, is simply to buy and sell. The office commences when the order is placed and ends when the transaction is complete. The risk of the venture is upon the customer who profits if it succeeds and loses if it fails. When the transaction is closed in accordance with the understanding of the parties, the broker gets only his commission and interest upon advances... .
... .
The relationship of agent and principal only existed between plaintiff and defendant when an order to buy or sell was placed, and terminated when the transaction was complete. That is, defendant was a broker and nothing more... . The affair entrusted to a broker who is to buy or sell through an exchange is to execute the order, not to discuss its wisdom.
The result is that at the time of the acts complained of in the present case, there was no "fiduciary relationship" between the parties and there was, accordingly, no breach of duty arising from such relationship.
.....
Where there is no special relationship of trust and confidence between a stockbroker and his customer the stockbroker is not liable for improvident speculation... .
.....
There was no pleading or proof of an express contract or special circumstances which required defendant to transmit to plaintiff the extrinsic facts or opinions in any way related to the market in question. Such a duty existing in the absence of a specific contract would be owed to every signatory of a margin agreement, whether or not he ever placed an order to buy or sell. The magnitude of this duty would be staggering in view of the testimony that each account executive has hundreds and possibly several thousand customers and would be so grossly burdensome as to be patently unreasonable.
The proposition becomes even more untenable when one attempts to analyze the claimed duty to inform. Plaintiff contends that he was entitled to know the significant facts. What are the significant facts? Does a broker have the responsibility to transmit every fact although it is only one of a myriad of facts which might have some bearing on the market? If a broker were under a duty to inform all of its customers of every fact which might bear upon any security held by the customer, the broker simply could not physically perform such a duty.
The complexity and variety of the factors affecting price are so great that any attempt to cast upon the broker the duty to determine, at his peril, which facts are relevant to each customer in each commodity would make the broker an insurer for the trader. Clearly the relationship was not intended as such.
To make this defendant or any other broker the guardian of a customer such as the plaintiff would destroy an important part of the marketplace. In every case a trader could recover damages from his broker merely by proving nontransmission of some fact which, he could testify with the wisdom of hindsight, would have affected his judgment had he learned of it. [Emphasis original]
337 F. Supp. at 111-113.
Commodities futures exchanges and trading are important to our national economy and have been regulated by Congress for over 70 years. Merrill Lynch, Pierce, Fenner & Smith v. Curran, 456 U.S. 353, 360, 102 S.Ct. 1825, 1830, 72 L.Ed.2d 182 (1981). This Court has no intention in this case of deviating from settled legal principles.

THE DIFFICULT QUESTION
There is a more difficult question arising from the facts of this case as related to us, one not specifically asked by the Court of Appeals, but raised by the Pucketts in their brief, and which presents this Court with a dilemma as to whether we should answer it or not.
*281 The question is, conceding the general rule of law that a commodities broker in a non-discretionary account only owes his customer the duty to properly carry out his instructions, would a custom or standard of the commodities brokers to warn customers who in their professional judgment are making imprudent and foolish futures trades increase the legal duty owed the Pucketts in this case? Conceding the accuracy of the affidavits of Jordan, Cullen and Giacona filed by the Pucketts, there is such a custom or standard recognized by the commodities brokers.
Our considered judgment is that we will not have rendered all the assistance we should give in this case without answering the question as applied to the facts related to us in this in this case.
To begin with, there is nothing in the related facts which suggests that the Pucketts knew of any such custom or standard, and therefore did not enter into any of their futures contracts under any assumption of its existence. The Pucketts never understood or believed RB & H had any such contractual or fiduciary obligation resulting from such a custom or standard, because there is nothing in the related facts to suggest they even knew of it. When Dr. Puckett began his course of trading through RB & H, there is nothing to suggest that in his mind he knew or believed this brokerage house had some duty under some in trade custom or standard to warn him as to his improvidence. RB & H did nothing to lead the Pucketts to believe there was such a custom. Had the Pucketts in directing the many futures trades and RB & H in carrying out their directions recognized the existence of such a custom or standard and relied upon it, we could of course have had an entirely different contractual relationship between the parties than that which they understood to exist. See, Dixon, Irmaos & CIA v. Chase Nat. Bank, 144 F.2d 759 (2nd Cir.1944), cert. denied Chase Nat. Bank of City of New York v. Dixon, 324 U.S. 850, 65 S.Ct. 687, 89 L.Ed. 1410 (1945).
In Postal Telegraph Co. v. Willis, 93 Miss. 540, 47 So. 380 (1908), a Jackson cotton buyer, Willis, by telegram made an offer to sell cotton, in turn accepted by telegram of the cotton merchant buyer in Mobile. The Jackson Postal Telegraph Office delayed delivery of the wire for several hours. In the interim, the Mobile merchant called the Jackson buyer, asked him if he had received the wire, and was told it had not been received. The Mobile buyer then withdrew his acceptance of the offer, to which Willis agreed. Willis later in the day sold the cotton at a reduced price, and sued Postal Telegraph for the difference.
This Court first noted the settled law that when the Mobile buyer delivered the telegram of acceptance to the telegraph office in Mobile, the contract was complete. It was argued by Willis that while this might ordinarily be the law, there was a custom in the cotton trade, recognized and acted upon by cotton buyers, that an acceptance was not binding until the telegram was actually received by the offeror.
We responded:
The contract made by the parties by virtue of these telegrams is clear, unambiguous, and valid, unless the so-called usage or custom can be invoked to relieve the parties from the legal effect of their acts. There is no such uncertainty about this contract as makes it necessary, because of indeterminate terms, to resort to custom or usage in order to understand exactly what was meant; but the contract is express in its terms, unambiguous, and became binding on the parties when the telegram of acceptance was delivered to the telegraph company in Mobile. It would be in the highest degree impolitic, and be the cause of introducing interminable confusion into the contracts, if, when the terms of a contract are express, clear, and valid under the law, its legal effect could be controlled by some local or trade custom. Our court has long since been committed to this wise doctrine. Shackleford v. N.O., J. & Great Northern Ry., 37 Miss. 202. In the case of Hopper v. Sage, 112 N.Y. 530, 20 N.E. 350, 8 Am.St.Rep. 771, citing many authorities, the court says: "Usage and custom cannot be proven to *282 contravene a rule of law, or to alter or contradict the express or implied terms of a contract free from ambiguity, or to make the legal rights or liabilities of the parties to a contract other than they are by the terms thereof.
When the terms of a contract are clear, unambiguous, and valid, they must prevail, and no evidence of custom can be permitted to change them." In the case of Shackleford v. New Orleans, Jackson & Great Northern Railroad Company, 37 Miss. 202, the court has said: "These usages, many judges are of the opinion, should be sparingly adopted, by the courts as rules of law, as they are often founded on mere mistake, or on the want of enlarged and comprehensive views of the full bearings of principles. Their true office is to interpret the otherwise indeterminate intentions of parties, and to ascertain the nature and extent of the contracts, arising, not from express stipulations, but from mere implications and presumptions and acts of a doubtful and equivocal character, and to fix and explain the meaning of words and expressions of doubtful or various senses. On this principle the usage or habit of trade, or conduct of an individual, which is known to the person who deals with him, may be given in evidence to prove what was the contract between them." 2 Greenleaf's Ev. § 251, and note 5. And the court further says that, where a custom or usage is resorted to, such customs must be certain, uniform, reasonable, and not contrary to law.
To the same effect is 2 Page on Contracts, p. 928: "The true and appropriate office of a usage or custom is to interpret the otherwise indeterminate intention of parties, and to ascertain the nature and extent of their contracts, arising, not from express stipulations, but from mere implications, assumptions, and acts of a doubtful or equivocal character."
47 So. at 381. Also, D.S. Pate Lumber Co. v. Weathers, 167 Miss. 228, 146 So. 433 (1933); O.J. Stanton & Co. v. Miss. State Highway Commission, 370 So.2d 909, 915 (1979), "The law of usage and custom and the courts cannot make contracts for parties."
Courts from other jurisdictions have rejected claims similar to the Pucketts seeking damages based solely upon a brokerage firm's in-house rules or a trade custom to warn customer investors of imprudent investments. Such rules "were never intended to protect him [the investor] from his own greed, as plaintiff seems to suggest." Instead, they "are designed to protect the broker from being saddled with losses which the investor is not able to cover, as was ultimately the case here." J.E. Hoetger & Co. v. Ascencio, 572 F. Supp. 814, 822 (D.C.Mich. 1983); Carras v. Burns, 516 F.2d 251 (4th Cir.1975); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Goldman, 593 F.2d 129 (8th Cir.1979); Farmland Industries v. Frazier-Parrott Commodities, 871 F.2d 1402 (8th Cir.1989). If the violation of the in-house rule or custom were accompanied by fraud, the rule would be otherwise. Goldman, 593 F.2d at 134. Compare, Thropp v. Bache Halsey Stuart Shields, Inc., 650 F.2d 817, 820 (1981), a case holding stockbrokers' own custom and standards of care may be used in establishing breach of proper legal standard in a discretionary account.
The Pucketts argue our recent case of Gilmore v. Garrett, 582 So.2d 387 (Miss. 1991), as authority for a legal duty on the part of RB & H to exercise some supervision. That case is distinguishable. Generally, prospective home owners place some reliance in the builder contractor for some guidance in the construction of their residences. Keyes v. Guy Bailey Homes, Inc., 439 So.2d 670, 671-672, 673 (Miss. 1983). In that case there was a certain, specific danger in the subsoil of which the contractor builder was aware, yet he gave no warning of its danger. Had Mr. Gilmore given the prospective home owner the equivalent advance warning of the danger inherent in constructing a home on this site that was given the Pucketts before they engaged in futures trading, he would have had escaped legal liability as well.
We therefore conclude that the trade custom and standard of care elucidated in *283 the Jordan, Cullen and Giacona affidavits, did not increase the duty RB & H owed the Pucketts in this case.
CERTIFIED QUESTIONS ANSWERED.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN and BANKS, JJ., concur.
PITTMAN, J., dissents, opinion to follow.
McRAE, J., dissents without written opinion.
PITTMAN, Justice, dissenting:
Believing that the limited fiduciary duty of a commodities broker includes a duty of ordinary care and a duty of loyalty to a customer of a nondiscretionary account, I respectfully dissent.
I first address the extent of a broker's duty to a customer of a nondiscretionary account. I agree with Justice Hawkins that the general law from other jurisdictions is that the duty is a very limited one. Some jurisdictions have found that there is no fiduciary duty unless there are special circumstances or a contract providing such. The Colorado Supreme Court explained that the stockbroker/customer relationship is not per se fiduciary in nature unless there is proof of practical control of a customer's account by a broker. Paine, Webber, Jackson & Curtis v. Adams, 718 P.2d 508, 517 (Colo. 1986). Likewise, the Wisconsin Supreme Court has found that even a broker who provides advice and counsel to a customer with a nondiscretionary account does not have a fiduciary duty to that customer. Merrill Lynch, Etc. v. Boeck, 127 Wis.2d 127, 377 N.W.2d 605, 608 (1985). The Boeck court explained further that there may be a fiduciary duty to a nondiscretionary account client where there is an express contract or other special circumstances. The Wisconsin justices never interpreted special circumstances. The majority in Boeck did find that a broker owes a customer a duty of ordinary care. Id. Other jurisdictions have also refused to impose a fiduciary duty in the case of nondiscretionary accounts. See, e.g., Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 337 F. Supp. 107 (N.D.Ala. 1971), aff'd. 453 F.2d 417 (5th Cir.1972), Leib v. Merrill Lynch, Pierce, Fenner & Smith, 461 F. Supp. 951, 952-953 (E.D.Mich. 1978), Shearson Hayden Stone, Inc. v. Leach, 583 F.2d 367 (7th Cir.1978), Caravan Mobile Home Sales v. Lehman Bros. Kuhn Loeb, 769 F.2d 561 (9th Cir.1985).
In a concurrence to Boeck, supra, Justice Abrahamson disagreed with the majority as to a broker's duty to a nondiscretionary account client. She explained that the relation is one of principal and agent, and the broker, like other agents, is a fiduciary. Id. at 613, citing 1 Restatement (Second) of Agency, sec. 1 (1958). In her concurrence, Justice Abrahamson also points out that the Boeck majority never explains "special circumstances". Id. at 615.
Justice Ceci of the Wisconsin Supreme Court strongly dissents to the Boeck majority. Justice Ceci suggested that a finding that a client's account is nondiscretionary is irrelevant in determining the existence of a fiduciary duty because even an experienced investor without full information will make poor investment decisions. Id. at 617. I am persuaded by both Justice Abrahamson and Justice Ceci of the Wisconsin Supreme Court that there is a fiduciary duty to a customer owed by a broker as well as a duty of ordinary care.
Other jurisdictions have found that there is a fiduciary duty, but only to properly execute trades as directed. In Index Futures Group, Inc. v. Ross, 199 Ill. App.3d 468, 145 Ill.Dec. 574, 557 N.E.2d 344 (Ill. App. 1 Dist. 1990), an appellate court of Illinois found that the duty of care owed by a broker carrying a nondiscretionary account for a customer is an exceedingly narrow one, consisting at most of a duty to properly carry out transactions ordered by the customer. Id. 145 Ill.Dec. at 578, 557 N.E.2d at 348, citing Anspacher & Associates, Inc. v. Henderson, 854 F.2d 941 (7th Cir.1988) and Refco, Inc. v. Troika Investment Limited, 702 F. Supp. 684 (N.D.Ill. 1988). And Illinois courts have explained that a commodities broker is the agent of his customer, at least with regard to the execution of a transaction; and, as such, as *284 a matter of law, he owes his customer certain fiduciary duties within the realm of the execution of the transaction. The fiduciary relationship depends on circumstances peculiar to a particular case. Martin v. Heinold Commodities, Inc., 139 Ill. App.3d 1049, 94 Ill.Dec. 221, 224-225, 487 N.E.2d 1098, 1101-1102 (Ill. App. 1 Dist. 1985). Proper execution of trades is the only duty generally imposed upon a commodities broker on a nondiscretionary account. Leib, supra, 461 F. Supp. at 953, Gochnauer v. A.G. Edwards & Sons, Inc., 810 F.2d 1042, 1049 (11th Cir.1987), First Union Brokerage v. Milos, 717 F. Supp. 1519, 1526 (S.D.Fla. 1989), Platsis v. E.F. Hutton & Co., Inc., 642 F. Supp. 1277, 1308 (W.D.Mich. 1986), Merrill Lynch, Pierce, Fenner & Smith v. Perelle, 356 Pa.Super. 165, 183-184, 514 A.2d 552, 561 (1986).
Clearly in the minority, California has adopted a broadened fiduciary duty of care owed by brokers to all customers, regardless of who controls the account. This duty requires more than merely carrying out the stated objectives of the customer. It can include informing the customer if the orders are improper and unsuitable. Duffy v. Cavalier, 259 Cal. Rptr. 162, 171, 210 Cal. App.3d 1514 (Cal. App. 1 Dist. 1989). I am persuaded by the California view.
Recognizing the general law of other jurisdictions, I would follow one of the following two (2) alternatives:
1. If we adopt the majority view of other jurisdictions that there is only a limited duty of a broker to a customer to properly execute trades as directed, I would find that this is one of the "special circumstances" in which the duty should be broadened to include regular assessment of the customer's resources and subsequent financial counsel. Because of Dr. Puckett's advanced age, substantial losses ($65,000 in one day included in a total loss of over $2,000,000 in thirty-eight months), and lack of experience, and because RB & H knew of Dr. Puckett's actions each day since RB & H provided him a desk, quote machine, comments from the floor of the Chicago Mercantile Exchange, and news service screen in the RB & H facility which he used several days each week to make trades, RB & H should have counseled with Dr. Puckett. This is a "special circumstance" in which RB & H owed at least a duty of ordinary care or a limited fiduciary duty.
2. Or, alternatively, I would prefer to see this Court draft its own law rather than adopt the reasoning of other jurisdictions. Since Mississippi law is silent as to the duty of a commodities broker, I would find that even though a broker's duties to a customer of a nondiscretionary account are minimal, such broker does have a duty of ordinary care and loyalty which includes regular assessment of the customer's resources and subsequent financial counseling regarding margin requirements for commodity futures trading accounts with the accompanying risks of liquidation of an undermargined account and liability for account deficits possibly far in excess of the total of margin deposits. Transactions in commodity futures entail a high degree of financial risk, and even where the account is nondiscretionary and the customer signs a risk disclosure statement containing an acknowledgment of the risk, a broker who is earning a fee from the customer's orders should regularly ascertain the suitability of a customer to make investments, especially where the customer has a lack of experience. The customer of a nondiscretionary account can then exercise independent judgment and take responsibility for all trading decisions. The broker can make an effort to see that the decisions made by the customer, whether wise or unwise, are at least informed decisions.
RB & H should have consulted with Dr. Puckett to find out if he could sustain such losses and how he was covering the losses. (Dr. Puckett was funding his losses by liquidating his pension fund.) RB & H should have then discussed courses of action. At this point, Dr. Puckett could exercise his own judgment and control over his nondiscretionary account. Experts at the trial concluded that RB & H's actions violated standards of conduct and the minimum standard of care generally recognized and accepted in the commodities industry. I conclude that a broker should have a *285 legal duty of care toward all customers. A commodities broker should have a duty to advise a customer to discontinue trading if the broker knows or has reason to know that the customer is trading excessively and irrationally, that the customer lacks the experience and ability to trade the commodities which he is trading, or that the customer has already incurred losses which are very high in proportion to the customer's net worth so that there is a high probability that the customer will lose his entire net worth if he continues to trade commodities. A commodities broker should be required to exercise that degree of care which a commodities broker of ordinary professional skill and prudence would exercise under similar circumstances. This duty is recognized where a customer has a discretionary account. Leib, supra, 461 F. Supp. at 953, Adams, supra, 718 P.2d at 515, Howell v. Freifeld, 631 F. Supp. 1222, 1224 (S.D.N.Y. 1986) RB & H did not fulfill this duty.
McRAE, J., joins this dissent.
NOTES
[1] From the record, it appears that Mrs. Puckett did her own trading for the first month or so. It is undisputed that from that time on Dr. Puckett traded both accounts himself.
[2] That a munificent government grants public largesse to rich and poor upon occasion (Chrysler, S & L bailouts, the welfare rolls), does not diminish either the validity or necessity of the principle when applied to individuals.
[3] Assuming it is not otherwise illegal to do so, as yet there is no common law liability imposed against the bartender who sells liquor to a man he knows has cirrhosis of the liver, or the bingo operator who sells the widow more bingo chances than she can afford, or the state which permits the people who can least afford it gamble in state-operated lotteries.
[4] Of course, as in any principal/agent relationship, the duties which the agent is required to perform on behalf of the principal are fiduciary in nature. Just as certainly, if there are no duties owed them, the non-duties cannot be fiduciary in nature. 3 C.J.S. Agency, § 271.