# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 96-FC-00481-SCT

*GEORGE MCINTYRE AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURG, PA*

*v.*

*FARREL CORPORATION*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/21/96 |
| TRIAL JUDGE: | HON. CHIEF JUDGE POLITZ, JUDGES DEMOSS AND SENNIS |
| COURT FROM WHICH APPEALED: | 5TH CIRCUIT, U.S. COURT OF APPEALS |
| ATTORNEY FOR APPELLANTS: | NA |
| ATTORNEY FOR APPELLEE: | NA |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | QUESTIONS ANSWERED - 9/19/96 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 10/10/96 |

### BEFORE PRATHER, P.J., ROBERTS AND MILLS, JJ.

### PRATHER, PRESIDING JUSTICE, FOR THE COURT:

## I. INTRODUCTION

¶1. The present case comes before this Court as a certified question from the Fifth Circuit Court of Appeals. The primary question presented to this Court for review is whether or not this State's statute of repose contained in Miss. Code Ann. §15-1-41 provides repose protection to a manufacturer of a piece of industrial machinery which becomes incorporated into a factory. This Court concludes that the Legislature intended for §15-1-41 to apply to architects, contractors and certain other professionals who are engaged in the real estate construction business and not to manufacturers of machinery or other products which, for whatever reason, become attached to real property. Accordingly, this Court concludes that §15-1-41 does not provide repose protection for such a manufacturer.

## II. AGREED STATEMENT OF FACTS

¶**2.** The parties submitted the following agreed statement of facts relevant to this dispute:

1.The plaintiff-appellant, George McIntyre, was injured on January 27, 1993, when he caught his left hand between the two in-running rolls of a four-roll L-calender, in the course of his employment at the Fidelity Tire Manufacturing Company plant in Natchez, Mississippi.

2. A "calender" is defined by the 1949 edition of the American Standard Safety Code for Mills and Calenders in the Rubber Industry as "a machine equipped with two or more heavy internally heated or cooled rolls revolving in opposite directions and used for continuously sheeting or plying up rubber compounds and for frictioning or coating fabric with rubber compounds." The original version of that Code had been adopted by the American Engineering Standards Committee in 1927. *See:* Safety Code for Rubber Mills and Calenders, ASA B28a-1927. Calenders come in many sizes and configurations. Although such machines are used for various industry purposes, they are widely used in the tire manufacturing industry to make the various plies that go into the construction of a tire.

3. Farrel's predecessors were pioneers in the development of calenders, manufacturing them for use in both the rubber and plastics manufacturing industries. Farrel engineer John Hinchcliffe testified that Farrell calenders were not mass-produced, but rather were custom-designed and manufactured for each individual purchaser. According to Hinchcliffe, there were no standard models of Farrel calenders; rather, separate engineering drawings were made for each machine.

4. The subject calender was manufactured by Farrel-Birmingham, Inc. and sold to the original owner and operator of the Natchez plant, Armstrong Tire and Rubber Company, in 1938. The calender was installed and put into use when the Natchez plant opened in 1939.

5. The calender weighs in excess of 100 tons. It was fully assembled at Farrel-Birmingham's Ansonia, Connecticut, facility before being disassembled, shipped in pieces by freight car and installed at the Natchez plant.

6. The calender has its own separate foundation, an engineering drawing for [sic] which was provided by Farrel-Birmingham's at the time of sale. Similar separate foundations are required for mills and other types of dynamic, heavily-loaded equipment, to isolate each such machine's vibrations from those of other plant operations. The foundation prescribed by the drawing for the subject calender is seven feet, five inches in depth and includes pits underneath the machine to allow for maintenance and cleaning. The calender is secured to its foundation by bolts ranging from one and one-half to two and one-quarter inches in diameter and from five feet, seven inches to six and one-half feet in length. The bolts were run through metal plates and nuts which were buried in the foundation, and the machine was then leveled by grouting. The calender has remained so affixed to its foundation in the same location as the Natchez plant since its original installation in 1939.

7. The calender is located in the mill room of the plant, where rubber components are mixed, milled, calendered and extruded before being delivered to the tire assembly area. It is one of a long series of machines used in the tire manufacturing process at the plant. The machine was originally used as a fabric calender, producing a rubberized sheet of cord used in bias ply tire construction. The plant's manufacturing process was restructured in 1963, with the subject

machine being converted to usage as a gum calender, producing two sheets of rubber which are laminated together downstream from the machine. Rubber is milled into strips and then transported by a conveyor which drops the rubber onto the calender. After being laminated, the calendered strips of rubber are moved by conveyor downstream to be cooled and wound up for delivery to the assembly area. Since 1963, the products of the calender have been inner liners used in tubeless tires and gum strips which reinforce component junctions in both bias ply and radial tires.

8. Condere Corporation, doing business as Fidelity Tire Manufacturing Company, acquired the Natchez plant from Armstrong in 1987. When Condere purchased the plant, it took a warranty deed to the real property, and a separate bill of sale for the "equipment" and "fixed assets" located at the facility which, according to the affidavit of Scott Kern, vice president and secretary of Condere, would have included the subject calender. Thereafter, in order to facilitate an industrial bond issue, Condere conveyed the property to the City of Natchez, which then leased it back to Condere. According to Kern, the conveyances to the City of Natchez were made as were those from Armstrong to Condere, with a separate warranty deed and bill of sale. A single lease agreement between the City of Natchez and Condere covers the site, the building, and the leased equipment. The subject calender appears on the list of leased equipment, and is said to include "associated feed conveyors . . . associated reduction gears and motors, overhead hoist system with monorail and hoist (and) fabric feed section."

9. While the subject L-calender has never been moved since its original installation in 1939, similar machinery has been moved from plant to plant by Condere and other tire manufacturers. In 1974, Armstrong moved a three-roll calender from the Natchez plant to a new facility in Tennessee. Armstrong later purchased and installed a four-roll Z-calender in the Natchez plant. Jerry Beach, Fidelity's plant engineer, testified by deposition that the L-calender could be removed without material damage to the structure of the plant. Kern's affidavit asserts that there is a market for used calenders in the industry.

### III. LEGAL ANALYSIS

¶3. The present case comes before this Court as a certified question from the United States Court of Appeals for the Fifth Circuit. Mississippi Rules of Appellate Procedure 20(a) "Certified Questions From Federal Courts," provides that:

(a) **When Certified.** When it shall appear to the Supreme Court of the United States or to any United States Court of Appeals, that there may be involved in any proceeding before it questions or propositions of law of this state which are determinative of all or part of that cause and there are no clear controlling precedents in the decisions of this Court, the federal court may certify such questions or propositions of law of this state to this Court for rendition of a written opinion concerning such questions or propositions of Mississippi law. This Court may, in its discretion, decline to answer the questions certified to it.

¶4. This Court still nominally adheres to the language of Rule 20(a) which requires that this Court deal only with questions of law and not issue a holding based on the facts of the case. *See*: ***Boardman v. USAA***, 470 So. 2d 1024 (Miss. 1985). In more recent cases, however, this Court has at times shown a willingness to address the particular facts of the case, and even, for all practical

purposes, to issue a holding based on the facts of the case. *See*: ***Puckett v. Refenacht, Bromagen & Hertz, Inc.***, 587 So.2d 273 (Miss. 1991). Rule 20(a) is thus subject to the discretion of this Court, and, although this Court generally strives to limit our inquiry to issues of law, we have clearly done otherwise in the past. In the present certified question, however, this Court elects to limit the analysis to considerations of law.

¶5. The first question certified to this Court queries as follows:

> **1. Is a large piece of industrial machinery, such as the Farrel 4-roll calender, used in a factory setting and semi-permanently installed an "improvement to real property" for purposes of §15-1-41?**

¶6. The answer to this question is that a "large piece of industrial machinery" *may* constitute an "improvement to real property" under Mississippi case law, subject to a major caveat expressed in the answer to the second certified question. The answer to this question can be gleaned from this Court's holding in ***Smith v. Fluor Corp.***, 514 So.2d 1227 (Miss. 1987), wherein this Court noted that § 15-1-41 does not define the term "improvement to real property" and held that "a definition of the phrase must follow the plain and ordinary meaning of the terms within the statute." ***Smith***, 514 So.2d at 1230. This Court in ***Smith*** thus declined to set forth a rigid factor or test to determine whether or not a given piece of property constitutes an "improvement to real property," but this Court did approvingly cite a number of cases from other states which interpreted statutes similar to § 15-1-41. ***Id.*** at 1230.

¶7. These cases cited in ***Smith*** interpreted such disparate pieces of property as coal-handling conveyors, surge tanks in an oil refinery, and a furnace installed in a store as constituting an improvement to real property within the meaning of the statutes of repose of various states. ***Id.*** This Court reaffirmed the ***Smith*** holding in ***Phipps v. Irby Construction Co.***, 636 So.2d 353 (Miss. 1993). Thus, a piece of industrial machinery *may* be considered to be an "improvement to real property," and this Court specifically held in ***Smith*** that a heat exchanger which was interconnected with other parts of machinery and equipment at a refinery did constitute an improvement to real property.

¶8. However, as discussed in the answer to the second certified question, the intent of the Legislature in passing §15-1-41 is most logically understood as having been to provide repose protection to parties such as architects, contractors, and engineers who are engaged in the construction business. Thus, this Court's answer to the second certified question will in most cases render irrelevant the fact that a given piece of machinery constitutes an improvement to real property for the purposes of § 15-1-41.

¶9. In arguing that the first question should be answered in the negative, McIntyre distinguishes ***Smith***, ***Phipps*** and the persuasive authority cited therein on the basis that the law set forth in these cases does not apply to manufacturers. As such, McIntyre is tacitly conceding that ***Smith*** and ***Phipps*** held that machinery may constitute an "improvement to real property" in cases in which, for example, a contractor is being sued for installing said machinery in a negligent manner. The real dispute in the present case, therefore, is with regard to the second question certified to this Court, which is dealt with in much greater detail in this opinion.

> **2. Is an original equipment manufacturer, such as Farrel-Birmingham, Inc. and its**

**corporate successors, that designs, manufactures, and ships a completed piece of industrial machinery an entity that performs or furnishes the "design, planning, supervision of construction, or construction" of an improvement to real property for purpose of §15-1-41?**

¶10. As discussed above, McIntyre nominally argues that the first certified question should be answered in the negative, but his real argument is that M.C.A. §15-1-41 was not intended to apply to manufacturers. McIntyre notes correctly that the vast majority of Mississippi cases and cases of other jurisdictions cited in *Smith* and *Phipps* did not apply the statute of repose to manufacturers. However, in *Trust Co. Bank v. U.S. Gypsum Co.*, 950 F.2d 1144, 1151 (5th Cir. 1992), the Fifth Circuit Court of Appeals ventured an *Erie*-guess as to this Court's view regarding the present issue:

> Citing a litany of cases applying the law of states other than Mississippi, Plaintiff Trust complains that USG is not a protected actor under the Mississippi statute of repose. But while it is true that some states have denied repose protection to the manufacturers of defective building products, Mississippi is not one of those states. Section 15-1-41 is much broader than most statutes of repose. . . . By its express language, section 15-1-41 extends repose protection to `any person ... furnishing the design, planning, supervision of construction or construction of (an) improvement to real property.'

¶11. The Fifth Circuit went on to note that:

> While the Mississippi Supreme Court has never expressly addressed the question (of) whether section 15-1-41 protects manufacturers, it has given the statute that effect. In *Smith v. Fluor Corp.*, 514 So.2d 1227 (Miss. 1987), the supreme court, on the basis of section 15-1-41, affirmed a summary judgment of a defendant manufacturer in a products liability action.

*Id.* at 1151, n. 15.

¶12. McIntyre disputes the characterization of the defendant in *Smith* as a manufacturer, asserting that said party was in fact a "builder of a refinery".The facts of *Smith* support McIntyre's assertion, revealing that the "Fluor Corporation built the Black Creek refinery for Pontiac Eastern Corporation." *Smith*, 514 So.2d at 1228. In the more recent *Phipps* case, this Court reaffirmed *Smith*, noting that, in said case, "we held that an addition of machinery to an oil refinery was an improvement to real property under the statute."*Phipps*, 636 So.2d at 354. *Phipps*, however, involved a suit against a construction company and a group of "industrial design engineers," the scope of whose businesses are not clearly set forth in the opinion. *Id.*

¶13. At any rate, it is clear that this Court has not squarely addressed the question of whether or not §15-1-41 was intended by the Legislature to provide protection to manufacturers. Although the Fifth Circuit ventured an *Erie*-guess in *Trust* that said statute did provide protection to manufacturers, the certification of the present question clearly indicates the unsettled nature of this question in the view of the Fifth Circuit, given that M.R.A.P. 20 only provides for certification of questions in cases in which there is no "clear controlling authority." Further, as will be discussed later, the Fifth Circuit expressed its view, in a case interpreting the Texas statute of repose, that the intent of the Texas legislature in adopting said statute was best interpreted as providing protection to such parties as architects, engineers, and contractors, but not manufacturers.

¶14. Miss. Code Ann. § 15-1-41, provides in pertinent part, that:

> No action may be brought to recover damages for injury to property, real or personal, or for an injury to the person, arising out of any deficiency in the design, planning, supervision or observation of construction, or construction of an improvement to real property, and no action may be brought for contribution or indemnity for damages sustained on account of such injury except by prior written agreement providing for such contribution or indemnity, against any person, firm, or corporation performing or furnishing the design, planning, supervision of construction or construction of such improvement to real property more than six (6) years after the written acceptance or actual occupancy or use, whichever comes first, of such improvement by the owner thereof.

¶15. There is nothing on the face of § 15-1-41 which limits said statute to "architects, engineers, and contractors," as the protected class of individuals is often referred to. Thus, a blind reading of the statute might lead this Court to conclude that a manufacturer was within the protected class of parties under §15-1-41, so long as the product manufactured constitutes an "improvement to real property" under *Smith* and *Phipps*.

¶16. However, a logical analysis of the statute, along with a review of the persuasive authority on point, leads inescapably to the conclusion that the Legislature did not intend for manufacturers to be within the protected class of parties under §15-1-41. By setting forth a statute of repose in the limited context of improvements to real property, the Legislature clearly did not intend to grant protection to all potential defendants. Thus, the question arises as to exactly which parties and in which circumstances the Legislature did intend to grant such protection. In concluding that a given party should be entitled to an enhanced degree of protection against liability, this Court can infer that the Legislature had a rational basis for granting such protection. There is no rational basis for the Legislature to have concluded that manufacturers of products which, for whatever reason, become attached to real property should be faced with a lesser degree of liability than that faced by manufacturers of more mobile products.

¶17. Moreover, contrary to the assertion of the Fifth Circuit in *Trust*, §15-1-41 is not "much broader than most statutes of repose." In fact, the statute is very similar to the language of the statutes of several states whose courts have concluded that the statute was not intended to apply to manufacturers. In *Luzadder v. Despatch Oven Co.*, 834 F.2d 355 (3rd Cir. 1987), for example, the Third Circuit Court of Appeals applied Pennsylvania law with regard to a statute of repose which provided protection to:

> any person lawfully performing or furnishing the design, planning, supervision, or observation of construction, or construction of an improvement to real property.

*Luzadder*, 834 F.2d at 359. Based on this statutory language, which is almost identical to the language of §15-1-41, The Third Circuit Court of Appeals noted:

> We believe that manufacturers have, for good reason, been excluded from the protection of Pennsylvania's statute of repose. Application of (the statute of repose) to manufacturers would cut the heart out of Pennsylvania's product liability law, by immunizing any manufacturing company fortunate enough to have its product turned into an improvement to real property. To

expand the scope of the repose statute to cover manufacturers would also work to draw an artificial distinction between manufacturers of different products, creating a situation where the maker of a furnace would be protected by the provisions of (the statute of repose), while the maker of an automobile would not be. No policy or reason can be cited to justify such incongruity.

*Luzadder*, 834 F.2d at 359-360.

¶18. The logic of the Third Circuit Court of Appeals is compelling, and said court is far from alone in expressing the aforementioned view.

¶19. In *Burmaster v. Gravity Drainage Dist. No. 2 of St. Charles Parish*, 366 So.2d 1381, 1385 (La. 1978), the Supreme Court of Louisiana interpreted a statute of repose which provided that:

No action whether ex contractu, ex delicto or otherwise, to recover on a contract or to recover damages shall be brought against any person performing or furnishing the design, planning, supervision, inspection, or observation of construction or the construction of an improvement to immovable property.

In interpreting this language, the Louisiana court did not actually find that the language served to exclude manufacturers or materialmen, given that the issue presented was one of the constitutionality of the statute. However, the court did state:

[A]ssuming arguendo that [manufacturers] are excluded from the language of the statute, we nevertheless find the statute constitutional as the exclusion is founded on a valid distinction. Suppliers and manufacturers, who typically supply and produce components in large quantities, make standard goods and develop standard processes. They can thus maintain high quality control standards in the controlled environment of the factory. On the other hand, the architect or contractor can pre-test and standardize construction designs and plans only in a limited fashion. In addition, the inspection, supervision and observation of construction by architects and contractors involves individual expertise not susceptible of the quality control standards of the factory.

*Burmaster*, 366 So.2d at 1386. Thus, the Louisiana Supreme Court concluded that a product manufactured under factory conditions and with the expectation that said product will be widely disseminated to the public may rationally be determined to be subject to a higher standard of liability than, for example, an individual house designed by a given architect who has the benefit of far fewer resources.

¶20. In *Snow v. Harnischfeger Corp. Elec. Co.*, 12 F.3d 1154, 1157 (1st Cir. 1993), the First Circuit Court of Appeals interpreted the Massachusetts statute of repose, which applies to "Action [sic] of tort for damages arising out of any deficiency or neglect in the design, planning, construction or general administration of an improvement to real property." The First Circuit did not have to venture an *Erie-*guess as to whether or not said statute applied to manufacturers, given that the Supreme Judicial Court of Massachusetts had held in *Dighton v. Federal Pacific*, 506 N.E.2d 509, 515 (Mass. 1987) that:

[W]e think that the Legislature, by enacting (the statute of repose) meant to protect providers of `individual expertise' in the business of designing, planning, constructing, and administering improvements to real estate. We reiterate that (the statute of repose) was not intended to apply to mere suppliers of standardized products, but only to the kinds of economic actors who perform acts of `individual expertise' akin to those commonly thought to be performed by architects and contractors- that is to say, to parties who render particularized services for the design and construction of particular improvements to particular pieces of real property.

Thus, the Massachusetts court applied an analysis based to a large extent on the analysis in *Burmaster*.

¶21. As mentioned earlier, the Fifth Circuit Court of Appeals has expressed an understandable reluctance to apply statutes of repose to manufacturers, although it has done so, citing binding state court decisions on point. In ***Dedmon v. Stewart-Warner Corp.***, 950 F.2d 244 (5th Cir. 1992), the Fifth Circuit, interpreting Texas law, expressed an inclination to exclude manufacturers from the protection of the Texas statute of repose, noting:

We suspect that the Texas Legislature intended the repose statute to protect a specific class of economic actors- construction-industry professionals who perform certain functions. But the broad wording of the statute blurs the intended boundaries of the class. . . . If we look for the correct analysis in the legislative intent of protecting architects, engineers, and contractors, we might be inclined to draw a boundary that includes only those persons who supply `individual expertise not susceptible of the quality control standards of the factory' and exclude manufacturers or suppliers of standardized goods such as circuit breakers, garage door openers, and mass-produced heating units. However, doing so would require us to depart from an unbroken line of authority developed in several Texas appellate court decisions applying the repose statute to manufacturers of such goods intended for use as improvements.

*Dedmon*, 950 F.2d at 250.

¶22. One of the Texas appellate court decisions cited by the Fifth Circuit Court of Appeals is ***Rodarte v. Carrier Corp.***, 786 S.W.2d 94 (Tex.App.-El Paso 1990). In **Rodarte**, Rodarte was electrocuted and killed by a heater-air conditioner unit which was designed, manufactured, and marketed by the Carrier Corporation, but which was installed at least twelve years prior to the date of the accident (although not by Carrier). The Texas court held that the action against the manufacturer was barred by Texas' ten-year statute of repose, which disallows all claims for damages, including wrongful death actions, against a person who "constructs or repairs an improvement to real property." *Rodarte*, 786 S.W.2d at 95.

¶23. The analysis of the Texas court was as follows:

The Appellant's initial complaints are that the statute of repose does not apply in this case because Carrier Corporation as a manufacturer had no role in the installation or servicing of this unit and that such unit was only a component part of a greater system and was not in itself an improvement. The statute only requires that the particular item in question be `an improvement to real property.' Courts have held that a heating or refrigeration system is an improvement to real property. (citations omitted).

***Rodarte***, 786 S.W.2d at 94.

¶24. Thus, the Texas court's sole inquiry was as to whether the air conditioner in question constituted an improvement to real property, and said court did not consider the issue of whether the Legislature had intended to apply the statute to a narrower class of construction industry professionals.

¶25. A second Texas appellate court decision cited by the Fifth Circuit in ***Dedmon*** as binding authority is ***Ablin v. Morton Southwest Co.***, 802 S.W.2d 788 (Tex.App.-San Antonio 1990). In ***Ablin***, the Texas court affirmed the dismissal of an action brought by the parents of a six-year-old boy who was choked to death by a garage door, allegedly as the result of a defective garage door opener which had been installed more than ten years prior to the accident. The Texas court in ***Ablin*** reached this decision after undertaking a thorough analysis of the extent to which the garage door opener was connected to the house and thus limited its inquiry to the issue of whether or not the garage door opener constituted an improvement to real property. ***Ablin***, 802 S.W.2d at 789.

¶26. There can be no more persuasive argument against the application of the statute of repose to manufacturers than the aforementioned Texas cases. Assuming they were able to establish liability on the part of the manufacturers, the families of the little boy in ***Ablin*** and the father in ***Rodarte*** would have presumably been entitled to substantial judgments to compensate them for their suffering if only the air conditioner unit and garage door opener in question had been attached to the house in a less permanent and fixed manner. Basing liability or a lack thereof on the extent to which a product is attached to real property is so arbitrary as to shock the conscience.

¶27. Quite apart from the arbitrariness of allowing or disallowing claims for grievous injuries based upon the mobility of products, the view of the Fifth Circuit and other previously mentioned federal appeals courts is much more persuasive when considered in light of the reality of legislative politics. It does not require an expert on the legislative process to understand that governing bodies more frequently engage in the passing of legislation based on classifications of people and professions rather than on arbitrary and irrational classifications of products. It is thus highly doubtful that the Legislature was motivated in passing §15-1-41 out of a desire to enhance the legal protection granted to manufacturers of products used as improvements to real estate over the protection granted to manufacturers of more mobile products.

¶28. Further evidence of the Legislature's intent can be gleaned from the language of the statute itself, which refers to the "construction" rather than "manufacture" of improvements to real property. In the case of a piece of machinery, the process of producing such machinery is, of course, referred to as the "manufacture" of the machinery, while "construction" is a term which is used in the context of the construction of buildings and other such structures. This point is simple and obvious, but it nevertheless constitutes an important basis for determining the intent of the Legislature.

¶29. In the view of this Court, the Legislature could not have intended to create an irrational dichotomy between those manufacturers whose products are used as improvements to real estate and those who are not. Such a distinction would serve not only to set differing standards of liability for different products, but also to establish differing standards of liability for identical products based solely upon how they are used by the customer. For example, a manufacturer of a crane would presumably be granted repose protection for a crane which was bolted down and integrated with

other machinery at a loading port, but would receive no protection for a crane which was used by a construction company at a variety of locations. Such an arbitrary result can not have been the Legislature's intent in passing §15-1-41.

¶30. The application of §15-1-41 to mass-manufactured products could lead to very dangerous and undesirable consequences for the citizens of this state. There are countless products which are generally used for a period far in excess of the six-year period set forth in the statute of repose, and such is particularly the case with products which are incorporated into buildings and houses. An interpretation of §11-1-63 in the manner urged by Farrel would in effect serve as a signal to manufacturers that they need exercise a lesser degree of care with regard to products which will be used as improvements to real property than with regard to other products. The manufacturer of gas or water pipes which are placed in buildings, for example, could specifically manufacture the pipes using cheaper materials which are designed to last a minimum of six years, knowing that it would face a lesser degree of liability or even no liability if said pipes leaked and caused injury to third parties more than six years after the pipes were installed.

¶31. In the view of this Court, the bottom line is that the Legislature intended to provide enhanced protection against liability to certain construction industry professionals such as architects and contractors based on the nature of the professions. Some members of this Court have expressed doubts as to the constitutionality of providing this protection at all, but the present question does not require this Court to consider this issue. Although the constitutionality of §15-1-41 in its entirety is thus not at issue in this certified question[1], this Court should nevertheless endeavor to limit the protection of said statute to the members of the professions to which it was intended to apply.

¶32. Therefore, this Court's answer to the second certified question is that an original equipment manufacturer that designs, manufactures, and ships a completed piece of industrial machinery is **not** an entity that performs or furnishes the "design, planning, supervision of construction, or construction" of an improvement to real property for purposes of §15-1-41.

¶33. **CERTIFIED QUESTION ANSWERED.**

**SULLIVAN, P.J., PITTMAN, BANKS, McRAE, ROBERTS AND SMITH, JJ., CONCUR. LEE, C.J., AND MILLS, J., CONCUR IN RESULT ONLY.**

1. Although McIntyre sought to have the issue of whether or not §15-1-41 violates the open courts provision of the Mississippi constitution certified, there is "clear controlling precedent" with regard to this issue in *Anderson v. Fred Wagner and Roy Anderson, Jr., Inc.,* 402 So.2d 320, 324 (Miss. 1982) and the Fifth Circuit therefore properly declined to certify this question pursuant to M.R.A.P. 20. Some members of this Court have expressed views contrary to the holding reached in *Anderson*, (*See*: *Phipps* dissent, 636 So.2d at 364-368) but *Anderson* remains controlling authority with regard to this issue, and M.R.A.P. 20 clearly indicates that the device of the certified question should be utilized only with regard to unsettled issues of law.